Jeffrey V. FUREK, Plaintiff Below, Appellant,

v.

The UNIVERSITY OF DELAWARE, a Delaware Corporation; Sigma Phi Epsilon, an unincorporated association; Sigma Phi Epsilon Fraternity, a Virginia Corporation, Defendants Below, Appellees.

Supreme Court of Delaware.

Submitted: Oral Argument— May 30, 1990.

Supplemental Briefing: Oct. 29, 1990.

Decided: July 24, 1991.

---

Roger A. Akin and Christopher J. Curtin (argued), Sawyer & Akin, P.A., Wilmington, for appellant.

Victor F. Battaglia, Sr. (argued), and Francis S. Babiarz, Biggs & Battaglia, Wilmington, for appellee University of Delaware.

Richard P.S. Hannum (argued), Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for appellee Sigma Phi Epsilon.

P. Clarkson Collins, Jr. (argued), Morris, James, Hitchens & Williams, Wilmington, for appellee Sigma Phi Epsilon Fraternity.

Before CHRISTIE, C.J., HORSEY and WALSH, JJ.

WALSH, Justice:

This is an appeal from a decision of the Superior Court that granted judgment notwithstanding the verdict, thus invalidating a jury award of damages, in an action brought by a student for injuries sustained in a fraternity hazing incident at the University of Delaware. The plaintiff below-appellant, Jeffrey V. Furek ("Furek"), had sought damages against the fraternity, Sigma Phi Epsilon ("Sig Ep"), its national affiliate, Sigma Phi Epsilon Fraternity, a Virginia corporation (the "National Fraternity"), the University of Delaware (the "University") and a fellow student Joseph Donchez ("Donchez"). During trial, the complaint was dismissed as to Sig Ep on jurisdictional grounds. After trial, a jury awarded damages in the amount of $30,-000.00, apportioned on the basis of ninety-three percent liability to the University and seven percent to Donchez with no finding of liability as to the National Fraternity.

In a post-trial ruling, the Superior Court granted a motion for judgment n.o.v. in favor of the University leaving Donchez liable for the entire judgment. Furek appeals from that decision as well as from rulings dismissing Sig Ep and denying punitive damages. Furek also challenges the jury's verdict regarding the National Fraternity. The University cross-appeals from the trial court's denial of motions for a directed verdict as to its defenses of contributory negligence and assumption of risk. We affirm the rulings concerning the local and national fraternity but reverse the grant of judgment n.o.v. as to the University.

I

The facts developed at trial reflect the following events. In September, 1979, Furek entered the University as a freshman after receiving a full football scholarship, which included tuition, room and board. During his freshman year, Furek played linebacker for the University football team. In the fall of his sophomore year, Furek decided to join the local chapter of Sig Ep after being encouraged to do so by several of the fraternity's members who were on the football team.

The University chapter of Sig Ep was established in 1908 through a charter issued by the National Fraternity.[1] In 1980, Sig Ep was one of two fraternities located on land owned by the University. The University leased the land to the Sigma Phi Epsilon Alumni Corporation which, in turn, constructed the fraternity house and permitted the members of the fraternity to occupy the house during their stay at the University.

In the fall of 1980, Furek began his pledge period at Sig Ep. The pledge period is an eight week initiation process during which pledges, those seeking to become members of the fraternity, are instructed concerning the history of the fraternity and undergo a process known as "brotherhood development." The pledges are also subjected to various forms of harassment known as "hazing". The culmination of the initiation process is a secret ritual known as "Hell Night"—an extended period of hazing during which the pledges are physically and emotionally abused. After Hell Night, the pledges are considered members of the fraternity.

For Furek and the other members of his pledge class, Hell Night took place on December 4, 1980. After assembling across the street from the Sig Ep house, wearing only T-shirts and jeans, the pledges were ordered to crawl on their hands and knees to the fraternity house while being sprayed by a fire extinguisher. Once inside the house, the pledges were ushered to various rooms where they were humiliated and degraded. Among other things, they were paddled, forced to do calisthenics and ordered to eat food out of a toilet.

1. Sigma Phi Epsilon Fraternity is a national fraternity headquartered in Richmond, Virginia. It issues charters to chapters at undergraduate universities and monitors and regulates those chapters. In 1980, there were approximately 240 Sigma Phi Epsilon chapters nationwide which were visited annually by representatives of the National Fraternity.

Donchez, a member of the fraternity, was stationed in the kitchen and assigned the task of pouring food on the pledges. The pledges were escorted into the kitchen blindfolded, and pancake batter, ketchup and other foodstuffs were poured on their heads. During this process, Donchez poured a container containing a lye-based liquid oven cleaner over the back and neck of Furek. Furek was escorted out of the kitchen and allowed to remove his blindfold. While waiting outside the kitchen, he was overcome by a burning sensation on his back and neck. He rushed to the bathroom and upon looking in the mirror observed the discoloration of the skin on his face, neck and back. He was then taken to the hospital and treated for first and second degree chemical burns. As a result of the events of Hell Night, Sig Ep had its charter revoked by the National Fraternity and the University withdrew the registration of the fraternity. Furek, permanently scarred, subsequently withdrew from the University and forfeited his football scholarship.

Although official policy directives from the University [2] and the National Fraternity forbade hazing, Sig Ep and other fraternities on the Newark campus had engaged in various forms of hazing for at least five years previous to the incident in question. Officers of the local fraternity were required to certify annually to the National Fraternity that hazing was not occurring. Apparently, this was done routinely although one former president of the fraternity testified that he returned the certification to the National Fraternity in 1977 with a notation that the "brotherhood development" program was *not* free of hazing.

In addition to the statements appearing in the Student Guide, the University through its Dean of Students issued a statement concerning sorority and fraternity hazing in 1978. The statement noted that "The Office of the Dean of Students assists fraternities and sororities in developing constructive activities and positive experiences for their members." The statement recited the "concern ... expressed, both nationally and locally over fraternity and sorority activities which may be deemed 'hazing.'" The directive listed specific instances of hazing which would "not be tolerated either on or off campus." These instances included "paddling or striking ... mental or emotional intimidation ... [and] forced participation in humiliating games, performances, stunts or any rough practical jokes."

In April, 1977, the Director of the University Health Service reported to John Worthen, the University Vice President for Student Affairs, that two students had been treated for injuries received during hazing. In one case, a student had been branded on the arm by a hot coat hanger. The following month, Stuart Sharkey, the University's Director of Housing and Residence Life wrote to the presidents of each fraternity sponsored by the University, including Sig Ep, concerning these incidents. Sharkey noted that the "University is appalled and alarmed that in 1977 this activity has occurred on our campus." He requested that each president "conduct a thorough review" of pledging practices and certify to the University that "your chapter will not engage in any form of hazing."

Two years later, in November, 1979, the Assistant Dean of Students again wrote to fraternity presidents to notify them of a "mandatory meeting" to discuss "a number of activities involving 'disruptive conduct' as well as possible instances of hazing pledges or forcing pledges to perform tasks and activities against their better judgment." In May, 1980 after a speech on campus by the mother of a student

---

**2.** The University of Delaware "Student Guide to Policies" for the 1980–81 academic year made explicit reference to hazing:

Respect for Dignity and Rights of Others
Respect for the dignity and rights of other students is a basic tenet of the academic community. Hazing, the subjection of an individual to any form of humiliating treatment and the violation of the rights of other students, have no place in the University community. The Guide also advised students that "The University reserves the right to deny registration to student groups whose major focus involves activities which expose their members to high bodily risk for which the University might to be considered liable."

killed in a hazing incident at another university, the University Dean of Students wrote to the presidents of the Interfraternity Council, with copies to the presidents of local fraternities and sororities endorsing the speaker's stand against hazing and noting the University's willingness to revoke the charter of any fraternity or sorority which "engages in such activity."

Despite the University's public pronouncement and warnings concerning hazing in the three years prior to Furek's injuries, the record reflects that the hazing activities at Sig Ep, and perhaps other fraternities as well, continued unabated on an annual basis. Groups of pledges, carrying paddles, were observed openly marching through the campus and on one occasion lining up on a public street across from the Sig Ep house, and the Sigma Nu house, to start Hell Night. Indeed, on a night prior to Hell Night, Furek and twenty-five other pledges dressed in dark clothes for "sneaking around" were stopped by University Security officers but were permitted to continue when the officers were advised that they were raiding the Sig Ep house as a pledging prank. Apparently, the University Security department was not made aware of the specific directives against hazing nor is there any indication that University Security was asked to investigate incidents of hazing prior to Furek's injury.

After some delay following Furek's hospitalization for his injuries, the hazing incident was reported to the University and eventually to the National Fraternity. The National Fraternity conducted a separate investigation and immediately revoked Sig Ep's charter. As a result, the local fraternity disbanded and ceased to exist as a fraternity at the University. Although the University conducted its own investigation of the incident, it was unable to secure the cooperation of knowledgeable students and thus did not initiate formal disciplinary proceedings against individual students or the local fraternity.

Furek filed his Superior Court action on September 9, 1982, naming as defendants the University, the National Fraternity, Sig Ep and Donchez and seeking both compensatory and punitive damages. In his complaint, Furek alleged that his injuries were proximately caused by the University's negligent and reckless failure to control Sig Ep and its members; the National Fraternity's negligent and reckless failure to monitor Sig Ep; Sig Ep's negligent and reckless failure to take steps to control the dangerous acts of its members; and Donchez's negligent and wanton failure to exercise reasonable care to ascertain what foreign substance he was pouring over Furek's body.

Prior to trial, a default judgment was entered against Sig Ep for failure to answer or make an appearance. Service had been made on the Delaware Secretary of State pursuant to the Delaware Long–Arm Statute, 10 *Del.C.* § 3104, and Robert Lundquist, the president of Sig Ep at the time Furek was injured.

In 1986, the National Fraternity moved to dismiss on the ground, that it did not have sufficient contacts with Delaware for the Superior Court to exercise personal jurisdiction and because Furek was not a resident of Delaware, he could not assert jurisdiction under 10 *Del.C.* § 3104. The Superior Court ruled that the National Fraternity had minimum contacts with Delaware as a result of its issuance of a charter to Sig Ep and that a non-resident may employ the Long-Arm Statute to obtain personal jurisdiction over a non-resident tortfeasor. *Furek v. University of Delaware et al.,* Del.Super., C.A. No. 82C–SE–30, Gebelein, J., 1986 WL 2837 (Jan. 9, 1986).

Concurrently with the filing of the National Fraternity's motion to dismiss on jurisdictional grounds, Donchez and the University moved for summary judgment. Donchez sought partial summary judgment on Furek's claim for punitive damages asserting that his conduct was not wanton or willful. The court ruled that this was an issue of fact precluding the grant of summary judgment. In its motion for summary judgment, the University claimed that it had no duty to protect Furek and that by engaging in prohibited hazing, Furek had assumed the risk that he might be injured. The Superior Court, relying upon

§ 315 of the Restatement of Torts, determined that the University had a duty to protect Furek through its control of the fraternity. In view of its knowledge of the dangers of hazing on its campus, Furek's claim against the University stated a cause of action as a matter of law. The court also ruled that factual issues precluded the grant of summary judgment on the defenses of contributory negligence and assumption of risk.

When the case proceeded to trial in 1987, Sig Ep appeared and moved to have the default judgment against it set aside and the action against it dismissed on the basis of ineffective service of process. The Superior Court granted both motions, ruling that in order to serve a defunct unincorporated association, as Sig Ep became when its charter was revoked, service was required to be made on each of the former members and not simply upon a former officer. Because Furek had failed to serve each of the members of the local fraternity, the action against the local fraternity was dismissed. *Furek v. University of Delaware, et al.*, Del.Supr., C.A. No. 82C–SE–30, Poppiti, J. (Oct. 22, 1987) (ORDER). Furek's action proceeded to trial and resulted in an award of $30,000.00 in compensatory damages. The trial court had previously directed a verdict in favor of all defendants on the claim for punitive damages. The jury apportioned ninety-three percent of liability to the University and seven percent to Donchez. The jury absolved the National Fraternity of liability.

Post-trial the University moved for a judgment n.o.v., contending that the evidence did not establish a legal predicate for the imposition of a duty on the part of the University to protect Furek from the actions of the fraternity or its members. The trial court agreed and granted the University's motion for a judgment n.o.v. *Furek v. University of Delaware*, Del.Supr., C.A. No. 82C–SE–30, Poppiti, J. (Dec. 23, 1987). The granting of the University's motion

rendered Donchez liable for the entire $30,000.00 judgment.

Furek has appealed the Superior Court's granting of judgment n.o.v. in favor of the University as well as the dismissal of his claim against Sig Ep, the denial of punitive damages and the jury's verdict in favor of the National Fraternity. The University has cross-appealed from the trial court's refusal to direct a verdict in its favor as to Furek's contributory negligence and assumption of risk.

## II

We address first the question of whether the Superior Court correctly dismissed Furek's action against Sig Ep on jurisdictional grounds. Furek contends that service upon a former officer of the local fraternity was effective, under Delaware law, notwithstanding the previous dissolution of the fraternity as an unincorporated association.

Furek filed his complaint in the Superior Court against all defendants on September 9, 1982. The complaint referred to Sig Ep as "an unincorporated fraternal association which ... engaged in most of its activities and conducted its business in Delaware." Through an amended complaint, Furek asserted he had determined that certain defendants resided outside the State and proceeded to effect service upon them pursuant to 10 *Del.C.* § 3104.[3] Included among the non-resident defendants Furek listed:

Robert Lundquist
President, Sigma Phi Epsilon
25 Siek Road
Butler, NJ 07405

It is not disputed that from March, 1980, through February, 1981 Robert Lundquist had served as Sig Ep's president and occupied that office at the time of Furek's initiation into the fraternity. On March 1, 1981, Lundquist was succeeded in the office of fraternity president by another individual. Shortly thereafter, Sig Ep's charter was revoked, the fraternity disbanded

---

**3.** Delaware's Long-Arm Statute, 10 *Del.C.* § 3104, provides a basis for the assertion of personal jurisdiction over any person, association, partnership or corporation for acts committed within the State if at the time of service such person has become a nonresident. *Harmon v. Eudaily*, Del.Super., 407 A.2d 232 (1979), *aff'd*, Del.Supr., 420 A.2d 1175 (1980).

and, for all practical purposes, ceased to exist. Thus at the time Lundquist received notice of the Furek complaint, he was not an officer of Sig Ep but could be deemed, at most, a former member of a dissolved unincorporated association. As previously noted, although initially the local fraternity failed to respond to service as a result of which a default judgment was entered against it, Sig Ep succeeded in having the default set aside and the action dismissed for lack of effective service.

Resolution of the question of whether the Superior Court acquired jurisdiction over Sig Ep requires consideration of two factors: Sig Ep's status on the date service was attempted and the method of service attempted.

■ As an unincorporated group or association of individuals, Sig Ep became subject to 10 *Del.C.* § 3904, Delaware's common name statute, which provides:

> An unincorporated association of persons, including a partnership, using a common name may sue and be sued in such common name and a judgment recovered therein shall be a lien like other judgments, and may be executed upon by levy, seizure and sale of the personal and real estate of such association, and also that of the persons composing such association in the same manner with respect to them as if they had been made parties defendant by their individual names. Satisfaction thereof may also be obtained by attachment process.

The basic purpose of "common name" statutes is to permit a noncorporate entity to sue, and be sued, in the name it presents to the public without the necessity of joining the various individuals who comprise the association. *Silliman v. DuPont*, Del.Super., 302 A.2d 327, 331 (1972), *aff'd sub nom. F.I. DuPont, Glore Forgan & Company v. Silliman*, Del.Supr., 310 A.2d 128 (1973).

While common name statutes, such as section 3904, are remedial in nature and provide the basis for entity treatment of unincorporated groups or associations,

their use, although often convenient, is not mandatory. Individuals comprising groups or associations may continue to be sued as individuals, just as individual partners may be sued without resort to the partnership name. *See Silliman v. DuPont*, 302 A.2d at 333. Before section 3904 was adopted, unincorporated associations could be sued through service upon individual members. Although this method was burdensome, it was nonetheless effective to the extent of those individuals actually served. 1 *Woolley Delaware Practice*, § 144, at 91 (1906). Thus, a plaintiff faced with the prospect of filing suit against an unincorporated association has two options: the obvious, and usually more convenient, service upon the entity under its common name or service upon the individuals who comprise the group. *See Fassett v. Delta Kappa Epsilon (New York)*, 3rd Cir., 807 F.2d 1150 (1986) (individual members of fraternity as of date of alleged tort named as separate defendants).

■ If service is attempted upon the association, *qua* association, under its common name, the requirements of Superior Court Civil Rule 4(f)(1)(III) control. It requires service upon "[an] unincorporated association which is subject to suit under common name by delivering copies of the summons, complaint and affidavit, if any, to an officer, a managing or general agent or to any other agent authorized by law to receive service of process and if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the defendant." The rule mandating service upon an agent or officer implicitly requires that at the time of service the person served be vested with the authority of the office designated. Even if it be assumed, arguendo, that the association continued to exist for purposes of suit after its dissolution, it is clear that after 1981 Lundquist occupied no office nor exercised any authority as Sig Ep's agent. Thus, to the extent that service upon him was attempted as a method of accomplishing binding service upon Sig Ep, such effort was a nullity.[4]

---

**4.** Furek did not attempt, or purport, to pursue

his claim against Lundquist as an individual

Furek argues that invalidating service under section 3904 would permit an unincorporated association to simply "turn off" liability through voluntary dissolution. While this result might foreclose an entity service approach, the option continues for service of individual former members. *See Schell v. National Flood Insurers Ass'n,* D.Colo., 520 F.Supp. 150, 156 (1981). Clearly the task is more difficult, but, logically, when the unincorporated entity no longer exists there must be an end to the authority of its former officers to represent it.

The Superior Court correctly determined that service upon Lundquist as a former officer of a defunct unincorporated association was a nullity and personal jurisdiction over Sig Ep, as an entity, had not been secured.

### III

■ We next consider Furek's challenge to the jury's determination that the National Fraternity was not liable for his injuries. Our standard of review is imparted by the Delaware Constitution which provides that "the findings of the jury, if supported by evidence, shall be conclusive." Del. Const. Art. IV, § 11(1)(a). Thus, if there is any competent evidence upon which the jury's verdict could be based, the findings of the jury will not be disturbed. *Turner v. Vineyard,* Del.Supr., 80 A.2d 177, 179 (1951). Furek does not attack the sufficiency of the trial court's instructions to the jury regarding the duty owed him by the National Fraternity nor does he question the ruling of the trial court that the National Fraternity could not be vicariously liable for any allegedly tortious conduct of Sig Ep. The sole inquiry, therefore, is whether the evidence of record, if believed, supports the jury verdict.

There was disagreement at trial concerning the extent of the National Fraternity's knowledge that hazing was occurring at Sig Ep and the measures it pursued to prevent such activities. The National Fraternity granted charters to local groups

who elect their own officers. The National Fraternity provided a measure of oversight through Regional Directors, who visit the local fraternity, and Chapter Counselors, alumni members of the fraternity who provide guidance to the local chapter. As previously noted, officers of Sig Ep were required to certify annually to the National Fraternity that "the brotherhood development program" was free of hazing. Furek points to the fact that in 1977 the then president of Sig Ep, Tony Glenn, reported to the National Fraternity that the local fraternity was *not* free of hazing. In later years, however, Glenn, acting as Chapter counselor, signed a no-hazing certification. Upon learning of the Furek injuries, in the spring of 1981, the National Fraternity conducted an investigation of the incident and withdrew Sig Ep's charter.

The extent of the National Fraternity's knowledge and control of hazing at the Sig Ep chapter is open to conflicting interpretations. While the National Fraternity was on notice through Glenn's 1977 report and the presence of pledge paddles observed on visits that hazing might be occurring, it did not exercise day to day control over local chapter activities. Moreover, there is evidence to support the National Fraternity's argument that by 1980 it believed its anti-hazing regulations were being observed. Although the extent of the National Fraternity's precise knowledge is disputed, we conclude that substantial evidence was introduced from which a jury could reasonably conclude that the National Fraternity exercised reasonable care to control the activities of the local chapter. Under our standard of review, we find no basis to disturb the jury's verdict respecting the National Fraternity.

### IV

The principal dispute in this appeal concerns what, if any, duty the University owed to Furek to protect him from the hazing activities of Sig Ep and its members, including Donchez. The definition of

---

member of Sig Ep although that course was conceivably available under the common law

option after service upon Lundquist under 10 *Del.C.* § 3104.

that duty in the Superior Court was subject to a series of rulings which finally resulted in the setting aside of the jury verdict against the University. It remains for this Court to give this novel issue an additional turn.

### A.

In denying the University's motion for summary judgment, the Superior Court rejected the contention that the University had no duty to protect Furek from his voluntary actions. The focus of the University's duty, the court held, was upon the control of the fraternity arising from the special relationship reflected in §§ 315 and 319 [5] of the Restatement (Second) of Torts (1965). The court also ruled that in view of the evidence suggesting that the University was aware of the "dangerous propensities of the fraternities as they related to hazing," and the fraternity's location on University property, it could not be said, as a matter of law, that no duty was owed to Furek. *Furek v. University of Delaware, et al.*, Del.Super., C.A. No. 82C–SE–30, Gebelein, J., 1986 WL 2837 (Jan. 9, 1986).

When the case proceeded to trial before another Superior Court judge, the issue of the University's duty continued to be a matter of dispute. At the conclusion of all the evidence, the defendants moved for directed verdicts on various issues. The University contended that the evidence failed to support the imposition of any duty on its part to protect Furek from the activities of the fraternity. The trial judge, noting that the factual predicate for the court's earlier ruling "had become so attenuated," rejected § 319 of the Restatement as a basis for submission of Furek's claim to the jury. Instead, the trial judge ruled that the evidence supported submitting Furek's claim

against the University under a "custodial negligence" theory based on § 324A(b) of the Restatement which provides:

§ 324 A. Liability to Third Person for Negligent Performance of Undertaking

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

\*    \*    \*    \*    \*    \*

(b) he has undertaken to perform a duty owed by the other to the third person,

\*    \*    \*    \*    \*    \*

After a reading of § 324A(b) of the Restatement, the trial judge gave the following instruction to the jury regarding the University's duty to Furek:

Before you may find the University of Delaware negligent, you must find,

(1) That the local fraternity was required to exercise reasonable care for the protection of pledges; and

(2) The University undertook a duty to provide reasonable care for the protection of pledges; and

(3) That the University failed to undertake reasonable care for the protection of the plaintiff; and

(4) Such failure constituted a proximate cause of the injuries as I have previously defined that term.

In his post-trial ruling which granted the University's motion for judgment n.o.v., the trial judge concluded that the evidence presented at trial did not support the application of § 324A(b). He ruled that

---

5. § 315. General Principle
   There is no duty to control the conduct of a third person as to prevent him from causing physical harm to another unless:
   (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct.

   \*    \*    \*    \*    \*    \*

   § 319. Duty of Those in Charge of Persons Having Dangerous Propensities

   One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

   \*    \*    \*    \*    \*    \*

§ 324A(b) applies "only when one undertakes to supplant the duty of another owed to a third person." Since the evidence did not demonstrate that Furek or any fraternity pledge "relied on the University for his own safety, nor believed that the University had undertaken a duty of protection in lieu of [the fraternity]," § 324A(b) finds no application.

Although he rejected § 324A(b) of the Restatement as a basis for fixing liability upon the University, the trial judge went on to determine "if an independent duty of care on the part of the University can be found to exist on facts in evidence." [6] The trial judge then proceeded to reject any duty on the University's part arising out of a special relationship in the general student-University context or by reason of the University's promulgation of an anti-hazing policy. Accordingly, the trial judge concluded that the evidence presented at trial presented no predicate for the imposition of a duty on the University and vacated the jury's determination that the University was ninety-three percent liable for Furek's injuries. The effect of the court's ruling was to render Donchez responsible for the entire amount of the jury's verdict.

### B.

Negligent behavior is usually defined as the failure to meet the standard of care which the law requires. However, liability for negligence is limited by the scope of the legally defined duty. Thus, an antecedent duty of care with respect to the interest involved must be established before liability is imposed. 5 F. Harper, F. James and O. Gray, *The Law of Torts*, § 18.1, at 650 (2d ed. 1986). The scope of the duty of care often turns on the relationship between the party claiming harm and the party charged with negligence. We here confront the broad question of whether the law imposes upon the relationship between university and student a duty, on the part of the university, to make and enforce policies which might protect the student from harm occasioned by the acts of third parties who function under the auspices of the university.

The university-student relationship is certainly unique. While its primary function is to foster intellectual development through an academic curriculum, the institution is involved in all aspects of student life. Through its providing of food, housing, security, and a range of extracurricular activities the modern university provides a setting in which every aspect of student life is, to some degree, university guided. This attempt at control, however, is directed toward a group whose members are adults in the contemplation of law and thus free agents in many aspects of their lives and life styles.[7] Despite the recognition of adulthood, universities continue to make an effort to regulate student life and the courts have utilized diverse theories in attempting to fix the extent of the university's residual duty.

### C.

In earlier times of strict university control, the institution was viewed as acting *in loco parentis*, *i.e.*, the university exercised delegated parental authority with a concomitant duty of broad protection. *See* Dodd, *The Non–Contractual Nature of the Student–University Contractual Relationship*, 33 U.Kan.L.Rev. 701, 702 (1985). The concept of university control based on the doctrine of *in loco parentis* has all but disappeared in the face of the realities of modern college life where stu-

---

**6.** Since the jury was instructed only on the application of § 324A(b) with respect to the University's liability, it is not clear how an evidential predicate for another legal basis for recovery would have permitted the jury verdict against the University to stand. However, because the University had moved for a directed verdict at the close of all the evidence, the court's denial of that motion is deemed to have submitted the case to the jury subject to a later determination of the legal question raised by the motion. Super.Ct.Civ.R. 50(b).

**7.** In *Healy v. James,* 408 U.S. 169, 197, 92 S.Ct. 2338, 2354, 33 L.Ed.2d 266 (1972), Justice Douglas in his concurrence noted: "Students—who, by reason of the Twenty-sixth Amendment, became eligible to vote when eighteen years of age—are adults who are members of the college or university community."

dents "are now regarded as adults in almost every phase of community life." *Bradshaw v. Rawlings*, 3rd Cir., 612 F.2d 135, 139 (1979), *cert. denied sub nom. Doylestown v. Bradshaw*, 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 261 (1980). To the extent that the doctrine of *in loco parentis* is still viable, its application is limited to claims against high school authorities for injuries to students arising out of a failure to supervise. *Rupp v. Bryant*, Fla.Supr., 417 So.2d 658 (1982).

The University contends that the demise of the doctrine of *in loco parentis* has dispelled the notion that any special relationship exists between the university and its student body upon which to posit any duty to protect students from activities of their fellow students. It is argued that the student and the university operate at armslength, with the student responsible for exercising judgment for his or her own protection when dealing with other students or student groups. In granting judgment n.o.v., the Superior Court, in effect, agreed with this argument by rejecting Furek's claim that lack of university supervision over the conduct of the fraternity was a proximate cause of his injuries. While we agree that the University's duty is a limited one, we are not persuaded that none exists.

A number of courts have examined whether a university's failure to supervise student activities could be deemed a breach of a duty arising from the student-university relationship. Some courts have been unwilling to impose liability because the university is not an insurer of its students safety, and the students are legally responsible adults who are able to take care of themselves. Thus, these courts have rejected both a duty under the *in loco paren-*

*tis* doctrine and a duty of supervision under Restatement § 314A when one assumes responsibility for another's safety or deprives another of a normal opportunity for self-protection.[8]

A leading decision which examined a university's duty of supervision and protection is *Beach v. University of Utah*, Utah Supr., 726 P.2d 413 (1986). Beach contended that the University, through an accompanying member of the faculty, breached an affirmative duty to supervise and protect her when she became intoxicated and fell from a cliff while participating in a university sponsored field trip. The *Beach* court held that a special relationship did not exist under § 314A sufficient to impose liability for the failure to protect and supervise the plaintiff once she became intoxicated. Nor did a duty arise because of a university prohibition against alcohol use and her status as a minor under state law. The *Beach* court concluded that "[a] realistic assessment of the relationship between the parties precludes our finding that a special relationship existed between the University and Beach or other adult students." *Id.* at 419.

The *Beach* court explicitly based its ruling on the social policy analysis set forth in *Bradshaw v. Rawlings*, 612 F.2d at 138–39, holding that the imposition of a duty to supervise extracurricular activities would be unrealistic and impossible to perform since it would place the university in a custodial relationship with its students who are legally adults. For essentially the same reasons, the Colorado Supreme Court sitting en banc in *Univ. of Denver v. Whitlock*, Colo.Supr., 744 P.2d 54 (1987), refused to find a breach of a duty of supervision where a student was injured while intoxicated and making use of a trampoline

---

**8.** Restatement § 314A is entitled "Special Relations Giving Rise to Duty to Aid or Protect." Listed under special relationships are a common carrier, an innkeeper and "a possessor of land who holds it open to the public" as well as:

(4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

Although § 314A does not include the university-student relationship in its list of special relationships, a caveat to that section states that "[t]he Institute expresses no opinion as to whether there may be other relations which impose a similar duty." Comment b to § 314A also provides that "[t]he relations listed are not intended to be exclusive, and are not necessarily the only ones in which a duty of affirmative action for the aid or protection of another may be found."

at his fraternity located on university premises. Citing Restatement § 314A, comment b, the *Whitlock* court concluded that there was not a relation of dependence sufficient to support a duty to supervise based on the status of the plaintiff as a student.[9]

Cases subsequent to *Bradshaw* which rejected a duty to supervise seem to rely on the policy analysis set out in *Bradshaw* without considering the factual validity of its premises or the accuracy and consistency of its logic. The *Whitlock* court stated that taking away students control over private recreational and personal safety choices would deprive students of their recently recognized authority in these areas. Citing the California Court of Appeals in *Baldwin v. Zoradi*, 123 Cal.App.3d 275, 176 Cal.Rptr. 809, 818 (1981) [10] with approval, the *Whitlock* court agreed with the proposition that "only by giving them responsibility can students grow into responsible adulthood." The *Whitlock* court concluded that taking away this responsibility would "produce a repressive and inhospitable environment, largely inconsistent with the objectives of modern college education." 744 P.2d at 60 (quoting *Beach v. University of Utah*, 726 P.2d at 419).

These cases provide no empirical support for the proposition that supervision is inversely related to the maturation of college students. Aside from the opinion in *Bradshaw*, no legal or other authority is cited for the assertion that supervision of poten-

tially dangerous student activities would create an inhospitable environment or would be largely inconsistent with the objectives of college education.[11] It seems equally reasonable to conclude that university supervision of potentially dangerous student activities is not fundamentally at odds with the nature of the parties' relationship, particularly if such supervision advances the health and safety of at least some students.

*Beach* and *Bradshaw* may also be faulted on the logic of their analysis. In both cases, it was asserted that the major reason for the rejection of a university duty to supervise was that the students were responsible adults. In both cases, the injuries were alcohol-related. However, in the area of activity that was the subject matter of the dispute, alcohol consumption, the students were unquestionably not deemed adults under the law since most, if not all, participants were below the drinking age.[12]

Despite the rejection of the *in loco parentis* doctrine, some courts continue to recognize the uniqueness of the student-university relationship. In *Mullins v. Pine Manor College*, 389 Mass. 47, 449 N.E.2d 331 (1983), the court upheld a jury verdict against a college for failure to provide adequate security to a student who was assaulted in a dormitory. The Court explicitly recognized a duty arising from the "existing social values and customs" as well as from the student-university relationship under Restatement § 314A and the duty of protection imposed under Restatement

---

**9.** The *Whitlock* court also rejected a duty based on the lease between the plaintiffs fraternity and the University. *See infra* at 522.

**10.** The *Baldwin* court examined the university duty arising from an injury occurring off campus that was allegedly the result of alcohol consumption in a university dormitory. *See infra* at 521.

**11.** *Bradshaw* suggested that the college revolts of the 1960's were the *direct* result of rigid controls in the university student relationship. It could be argued with equal force, however, that the revolts were the result of intellectual and political coercion, and not directed against the supervision of potentially dangerous recreational activities. It is difficult to believe that

university students protested in the 1960s to prevent the use of trampolines at fraternities or the right to haze fraternity pledges.

**12.** In *Bradshaw*, the court noted that although the legal drinking age in Pennsylvania was 21, while the overwhelming number of other states and foreign jurisdictions permit drinking at age 18. The court thus viewed the "reality" that the university could not be expected to enforce a state law against students who came from other jurisdictions. In fact, since *Bradshaw* was decided in 1979, the national trend has been to raise the drinking age in recognition of the problem of alcohol related activities on and off college campuses. Delaware, Maryland, and New Jersey have all raised the drinking age since *Bradshaw* was decided.

§ 323.[13] The "consensus" duty resulted from the recognition of the unique situation created by the concentration of young people on a college campus and the ability of the university to protect its students. Finding a concurrent duty under Restatement § 323, the *Mullins* court defined the university's duty to include "reasonable care to prevent injury to their students by third persons whether their acts were accidental, negligent, or intentional." *Id.* 449 N.E.2d at 337.

Other courts have recognized, although denied liability under, the duty to supervise arising from the special relationship between university and student. In *Rubtchinsky v. State University of N.Y. at Albany*, Ct.Cl., 46 Misc.2d 679, 260 N.Y.S.2d 256 (1965), the plaintiff sought damages allegedly arising out of the university's negligent failure to supervise a "push ball game" that was part of student orientation. The *Rubtchinsky* court held that even though the college had control over the activities, there was no duty to supervise "unless such activities are so inherently dangerous that the college authorities are under actual or constructive notice that injuries may result to students." *Id.* 260 N.Y.S.2d at 259.

A duty to supervise dormitory activities involving alcohol consumption was also deemed to support a jury verdict of partial university liability in *Zavala v. Regents of the University of Cal.*, 125 Cal.App.3d 646, 178 Cal.Rptr. 185 (1981).

The task of attempting to determine the extent of the legal duty owed by the University to Furek was the subject of scrutiny by two different Superior Court judges. At the summary judgment stage, it was ruled that the special relationship arising out of control of third persons "having dangerous propensities" under Restatement § 319 [14] supported the imposition of such a duty. While we do not reject entirely the concept that the relationship between the university and the student can be "special," in our view the custodial arrangement envisioned by § 319 does not embrace the degree of control which can be reasonably expected by a university over student organizations. The "custody" envisioned by § 319 finds application in situations involving close physical control such as occurs in hospital settings. This distinction is made clear in the Restatement Comment which notes § 319's application to two situations: (1) where the actor has charge of a class of persons "to whom the tendency to act injuriously is normal" or (2) where the actor has charge of an individual who does not belong to a dangerous class but "has a peculiar tendency" to act dangerously which the actor knows or should know. We do not view the fraternities, or their individual members, as falling within the class of persons whose dangerous activities impose a special duty under § 319. Accordingly, we agree with the University that a § 319 standard is not appropriate to measure its duty in this case.

■ We do not agree, however, with the trial judge that no legal basis exists for imposing on the University a duty to protect Furek under the circumstances of this case. Certain established principles of tort law provide a sufficient basis for the imposition of a duty on the University to use reasonable care to protect resident students against the dangerous acts of third parties. While we acknowledge the apparent weight of decisional authority that there is no duty on the part of a college or university to control its students based *merely* on the university-student relation-

---

**13.** Restatement (Second) of Torts § 323 states:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

**14.** § 319 Duty of Those in Charge of Persons Having Dangerous Propensities

One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

ship, where there is direct university involvement in, and knowledge of, certain dangerous practices of its students, the university cannot abandon its residual duty of control.

The trial judge initially ruled that Restatement § 324A was the proper standard upon which to support the imposition of a duty on the University and instructed the jury to that effect. Restatement § 324A is a special instance of the duty recognized in § 314 that "the actor may have committed himself to the performance of an undertaking, gratuitously or under contract, and so may have assumed a duty of reasonable care for the protection of the other, or even third persons as stated in §§ 323, 324 and 324A." There appears to be no decisional authority which supports, or denies the imposition of liability under § 324A. We agree with the trial judge that § 324A is not applicable to Furek's claim since the assumption of the duty by the University to regulate and enforce hazing was not directed to, or intended as a substitute for, the duty owed by the fraternity to Furek. Although the local fraternity may have had a duty to Furek, the University's duty of rule promulgation and enforcement was separate.

■ In our view, Restatement § 323 offers a more persuasive rationale for University liability, and a jury instruction invoking § 323 was unsuccessfully sought by Furek at trial. Unlike the responsibility shifting effect of § 324A, § 323 addresses the duty owed by one who assumes direct responsibility for the safety of another through the rendering of services in the area of protection. As the Restatement comment makes clear, this section "applies to any undertakings to render service to another which the defendant should recognize as necessary for the protection of the other person" and the harm to be protected against results from negligence in "performance of the undertaking or from failure to exercise reasonable care to complete it or to protect the other when he discontin-

ues it." If one "takes charge and control of [a] situation, he is regarded as entering into a relation which is attenuated with responsibility." W. Prosser, *Handbook of Torts*, 56 (2nd ed. 1972). This provision of tort law is encapsulated in Restatement § 323 and has been recognized by this Court. *See Jardel Co., Inc. v. Hughes*, Del.Supr., 523 A.2d 518, 524 (1987).

■ While § 323 provides the basis for a duty of protection once assumed, the University argues that it assumed no responsibility to protect Furek from the dangers of hazing and, given his adult status, Furek could not reasonably have relied upon the University to do so. The evidence in this record, however, strongly suggests that the University not only was knowledgeable of the dangers of hazing but, in repeated communications to students in general and fraternities in particular, emphasized the University policy of discipline for hazing infractions. The University's policy against hazing, like its overall commitment to provide security on its campus, thus constituted an assumed duty which became "an indispensable part of the bundle of services which colleges ... afford their students." *Mullins v. Pine Manor College*, 449 N.E.2d at 336.

■ Even though Restatement § 323 provides a basis for the University's assumed obligation toward Furek, and all students subjected to the known dangers of hazing, a claim for recovery in this case may also be posited upon Furek's status as an invitee on University property. A landowner who knows or should know of an unreasonably dangerous condition or use of his property has a duty to invitees to safeguard the invitee against such hazards including the conduct of third parties. This Court has applied that principle as reflected in the Restatement of Torts to sustain liability against both a private landowner in *DiOssi v. Maroney*, Del.Supr., 548 A.2d 1361 (1988) (applying Restatement § 343) and a commercial landowner in *Jardel v. Hughes* (applying Restatement

§ 344, the commercial counterpart of § 343).[15]

■ The question of whether a university, *qua* landowner, owes its students a duty extending to invitees is one of first impression in Delaware but has been considered elsewhere. In *Stockwell v. Board of Trustees*, 64 Cal.App.2d 197, 148 P.2d 405 (1944), a student successfully maintained an action against a university for failure to maintain its premises in a safe condition. The student, held to be an invitee, was injured on university property by a BB gun shot by an individual whose presence was known to the university. The finding of liability was predicated on the university's failure to enforce its rules forbidding the use of BB guns and the fact that inadequate security was maintained. In *Peterson v. San Francisco Comm. College Dist.*, 36 Cal.3d 799, 205 Cal.Rptr. 842, 685 P.2d 1193 (1984), a student pursuing a claim for assault by a third party on university property was considered an invitee "to whom the possessor of the premises would ordinarily owe a duty of due care." The *Peterson* court noted that characterizing "students as invitees is not a novel proposition." *Id.* 685 P.2d at 1198 n. 6, and by analogy to the private landowner duty in Restatement § 344, found a duty to protect the defendant from dangerous conditions.[16] To the same effect is the holding in *Bearman v. University of Notre Dame*, Ind.App., 453 N.E.2d 1196 (1983).

While Furek may be deemed an invitee, the University's duty to protect him from dangerous conditions under Restatement § 344 is not absolute. The duty extends only to the acts of third persons which are both foreseeable and subject to university control. With respect to foreseeability, Comment f to § 344 is instructive:

> Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of the third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.

■ In *Jardel*, this Court recognized that "application of the principle of foreseeability to claims based on nonfeasance— here not anticipating acts of third parties— may prove difficult." 523 A.2d at 525. But where the property owner has attempted to provide security or regulate a hazardous activity, such affirmative action is, in itself, at least tacit recognition that the

---

15. § 343. Dangerous Conditions Known to or Discoverable by Possessor
    A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
    (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
    (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
    (c) fails to exercise reasonable care to protect them against the danger.
    § 344. Business Premises Open to Public: Acts of Third Persons or Animals
    A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to
    (a) discover that such acts are being done or are likely to be done, or
    (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.

16. The *Peterson* court limited the "dangerous conditions" element of § 344 to physical defects. This Court in *DiOssi*, however, construed the term "condition" in § 343, a correlative provision, to include "the conduct of other persons on the premises." 548 A.2d at 1366.

potential for harm exists on the premises. In view of past hazing incidents involving physical harm to students, the occurrence of the unusual activities preceding fraternity hazing as witnessed by campus security (i.e. students marching with paddles) and the common knowledge on campus that hazing occurred, there was sufficient evidence for jury determination on the issue of whether the hazing which caused injury to Furek was foreseeable.[17]

■ There remains the question of control, a matter which was hotly disputed at trial and is the principal basis for the trial court's rejection of Furek's claim against the University. On appeal, the University points to the fact that it owned the land on which the fraternity house was built but not the house itself and argues that its status as a landowner conferred no right to control what occurred on the premises. This is too limited a view of the realities of the university-fraternity relationship at the time of Furek's injuries. It is true that the University did not attempt or purport to regulate day-to-day living conditions in the Sig Ep fraternity house. But in the area of general security and of hazing in particular the University's regulation was pervasive. The Sig Ep fraternity house was located within campus boundaries and was thus subject to the University's security department. The University's ban on hazing, as evidenced by its directives to fraternity officers, made no distinction between activities occurring within or outside fraternity buildings. Indeed, in this case the University's unsuccessful attempt to initiate disciplinary proceedings against Sig Ep because of Furek's injuries clearly evidences its belief that it had the authority to enforce anti-hazing regulations for violations occurring within the fraternity house.

Premises control is not determined in absolute terms. A landowner may exercise control in certain areas while relinquishing it in others. In *Jardel*, this Court, in discussing the issue of landowner control in a parent-subsidiary context, noted that where the parent corporation exercised "direct operational control in several management areas, including security decisions.... the jury was entitled to draw the inference, at least in the area of security arrangements" that the landowner-parent exercised direct control. 523 A.2d at 526–27. If control includes authority to direct, restrict and regulate, the University with its significant involvement in the regulation of fraternity life, particularly in the area of hazing, may be deemed to have exercised supervision over the use of its property to permit "at least the inference of control." For the purpose of testing the sufficiency of the evidence to withstand the granting of a directed verdict, Furek was entitled to the benefit of that inference.

■ In sum, although the University no longer stands *in loco parentis* to its students, the relationship is sufficiently close and direct to impose a duty under Restatement § 314A. *Mullins v. Pine Manor College*, 449 N.E.2d at 336. The university is not an insurer of the safety of its students nor a policeman of student morality, nonetheless, it has a duty to regulate and supervise foreseeable dangerous activities occurring on its property. That duty extends to the negligent or intentional activities of third persons. Because of the extensive freedom enjoyed by the modern university student, the duty of the university to regulate and supervise should be limited to those instances where it exercises control. Situations arising out of the ownership of land, and within the contemplation of Restatement § 344, involving student invitees present on the property for the purposes permitted them are within such limitations.

As noted by the *Bradshaw* court, "duty is not sacrosanct in itself, but only the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection." 612 F.2d at 138 (quoting W. Prosser, *Law of Torts* 333 (3d ed. 1964)). Even though the policy analysis of Bradshaw has been fol-

---

**17.** If a railway company has a duty to control the foreseeable dangerous activity of university students awaiting the return of their victorious football team for the protection of a business invitee, it would seem reasonable to conclude that a university would have a similar duty to supervise dangerous activities on its campus to protect its invitee students. *See* Restatement § 344, Illustration 2.

lowed by numerous courts, the justification for following that decision has been seriously eroded by changing societal attitudes toward alcohol use and hazing.[18] The likelihood of injury during fraternity activities occurring on university campuses is greater than the utility of university inaction. The magnitude of the burden placed on the university is no greater than to require compliance with self imposed standards.

The University's motion for a directed verdict should have been granted only if the jury could not, under any reasonable view of the evidence justifiably find in favor of Furek and against the University. *Hyman Reiver & Company v. Merlonghi,* Del.Supr., 236 A.2d 367 (1967). In the light of that standard and our view of the University's duty in this case, we conclude that the Superior Court erred in granting the University's motion for judgment n.o.v. based on the merits of its motion for a directed verdict.

### V

Two of the remaining issues in this appeal are subject to summary disposition. Furek complains that the trial judge committed error in dismissing his claim for punitive damages against all defendants despite the earlier ruling of another Superior Court judge which denied the University's motion for summary judgment on the issue of punitive damages. The argument fails to comprehend the differing standards which govern the denial of a motion for summary judgment under Superior Court Civil Rule 55 and granting of a directed verdict at trial.

■ In refusing to grant summary judgment in favor of the University and Donchez on the issue of punitive damages, the Superior Court ruled that factual issues, and the favorable inferences to be drawn therefrom, supported claims of "willful and wanton conduct" on Donchez's part and "purported inaction reach[ing] the level of the 'I don't care attitude' on the part of the University." At trial, the full

particulars of the University's role in the hazing incident were presented. Although the University's conduct might be faulted in terms of its failure to exercise greater control over a known hazardous activity, the trial judge correctly applied the standard for recovery of punitive damages reflected in this Court's decision in *Jardel v. Hughes.* While the University is chargeable with notice of hazing activities on its campus in the years preceding Furek's injuries, its response, which a jury could deem ineffectual, was, nonetheless, well-intentioned and not characterized by a conscious disregard of a known risk. The Superior Court did not err in dismissing Furek's claim for punitive damages.

■ The University has cross-appealed from the trial court's refusal to grant a directed verdict on its defenses of contributory negligence and assumption of risk. The burden of proof as to these affirmative defenses was, of course, upon the University. We agree with the Superior Court that while Furek voluntarily participated in the hazing, he was not chargeable with knowledge that he would be exposed to the risk that someone would pour a caustic substance over his head as part of a fraternity ritual. The failure to anticipate another's negligence or dangerous activity does not itself demonstrate such lack of care so as to bar recovery for injury. *Levine v. Lam,* Del.Supr., 226 A.2d 925, 926 (1967). Similarly, one does not assume a risk unless he appreciates its danger but takes no steps to avoid it. *Robinson v. Meding,* Del.Supr., 163 A.2d 272, 276 (1960). In gauging the conduct of the plaintiff, the standard to be applied is a subjective one, *i.e.* did the plaintiff, in fact, understand and appreciate the risk involved in a known situation. *Yankanwich v. Wharton,* Del.Supr., 460 A.2d 1326, 1330 (1983) (citing Restatement of Torts 2d § 496D). In resisting the University's motion for a directed verdict on these two affirmative defenses, Furek was entitled to have the evidence viewed from a perspective favorable to him. So viewed, the evidence did not justify Superior

---

**18.** Many states have passed laws making hazing a criminal offense. *See* Note, *Hazing and the*

*"Rush" Toward Reform,* 16 J.C.U.L. 93 (1989).

Court's granting of the University's motion and we affirm its ruling.

## VI

■ Our ruling that the evidence presented at trial provided a factual predicate for the submission to the jury of Furek's claim against the University requires that we reverse the decision of the Superior Court granting judgment n.o.v. in favor of the University. As previously noted, however, we agree with the Superior Court that the University's duty does not find definition in Restatement § 324A and the jury instruction based on this section was erroneous. Since the trial court did not instruct the jury on any alternative basis for the University's liability, the jury verdict cannot stand. We have already concluded that the jury's verdict as to the National Fraternity is separately sustainable and thus we are required to address the question which was the subject of supplemental briefing: In the event the issue of the University's liability for compensatory damages must be remanded for a new trial, is the jury's determination of damages also subject to retrial?

■ Under the common law, when a jury verdict was ruled partially incorrect, the court was required to order a new trial as to all issues since the judgment was considered indivisible. *See Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 497, 51 S.Ct. 513, 514, 75 L.Ed. 1188 (1931). The modern trend, and the rule in Delaware, is to permit the court to award a partial new trial when issues are severable and no injustice will result from retaining the verdict upon other issues. *Chrysler Corp. v. Quimby*, Del.Supr., 144 A.2d 123, 126 (1958). A full retrial is ordinarily required only where the issues of liability and damages are interwoven. *Id.* at 137.

The question of severability usually arises where the necessity for a new trial is a result of an erroneous determination of damages. *See* 6A Moore's Federal Practice ¶ 59.06, at 59–57 (1991). Thus, an inadequate award of damages may be remedied without relitigation of liability where the

damages determination is not dependent on, or intertwined with, evidence of liability. *Yates v. Dann*, D.Del., 11 F.R.D. 386 (1951). However, where the liability and damages issues are "sufficiently independent to preserve the findings on damages," a new trial may be limited to the issue of liability. *Pressey v. Patterson*, 5th Cir., 898 F.2d 1018, 1024 (1990). Such a disposition is particularly appropriate where the jury arrives at its decision by detailed special verdicts. *Akermanis v. Sea–Land Service, Inc.*, 2d Cir., 688 F.2d 898, 906 (1982). Moreover, in light of the ever increasing backlog in our trial courts, there is a trend favoring partial new trials. *Cf. Brimbau v. Ausdale Equipment Rental*, 120 R.I. 670, 389 A.2d 1254, 1255 (1978).

■ The issues of liability and damages in this case appear clearly divisible. We have sustained the trial court's rejection of Furek's claim for punitive damages and he has not challenged the adequacy of the jury's award of compensatory damages. Moreover, the jury's verdict was rendered in the form of answers to seven separate and detailed interrogatories only one of which addressed the damages claim. The jury's assessment of damages was made only after it had separately considered Furek's liability assertions against each of the remaining defendants—Donchez, the University and the National Fraternity—as well as having separately determined that Furek was not contributorily negligent nor had assumed the risk of injury. Manifestly, the liability determinations rendered by the jury in this case are not interwoven with, nor dependent upon, any assessment of damages. No purpose would be served by permitting the parties to present evidence on damages or requiring the jury to further consider the question. Accordingly, our remand for a new trial shall be limited to the question of proportionate liability between Donchez and the University.

## VII

Finally, there remains the problem presented by a post-trial development which essentially eliminated Donchez from

further participation in this case. During the pendency of this appeal but before the completion of the initial briefing, Furek settled with Donchez for $29,900.00 ($100 less than the jury award) and executed a joint tortfeasor's release pursuant to 10 *Del.C.* § 6304(a).[19] Upon disclosure of this fact, the Court ordered supplemental briefing on the effect of that release upon the pending appeal and any subsequent remand.

In addition to extinguishing Furek's claim against Donchez, the release provides in pertinent part:

The dismissal [of the appeal and cross appeal] will not affect the plaintiff-releasor's actions and appeals otherwise pending.... By this Release, Releasor is releasing only his claims against Releasee, Joseph Donchez and those claiming under him. Releasor expressly reserves all rights, claims, and causes of action that he may have against the University of Delaware, Sigma Phi Epsilon National Fraternity, Sigma Phi Epsilon Local Fraternity and its members at the time of the incident or against any other individual, organization or corporation, or their respective heirs, legal representatives, successors, or assigns. In addition, Releasor expressly reserves any right that he may have to proceed against any such other party.

The release also provides for a refund to Donchez of a portion of the compensatory damages recovered from any other party, to a maximum of fourteen thousand nine hundred dollars ($14,900.00):

If upon appeal, Releasor is successful in reinstating the verdict of the jury, Releasor will reimburse Releasee the sum of Fourteen Thousand Nine Hundred Dollars ($14,900.00). If Releasor is not successful in reinstating the verdict, but Releasor obtains a new trial and/or through compromise, settlement, or judgment, Releasor [recovers] a sum of money,

then Releasor will reimburse Releasee fifty percent (50%) of the amount recovered up to a maximum total reimbursement of Fourteen Thousand Nine Hundred Dollars ($14,900.00).

■■■ Furek contends that his receipt of almost the entire amount of the jury's award of compensatory damages from one joint tortfeasor should not prevent recovery from other joint tortfeasors with respect to claims still viable on appeal. On a theoretical level, this argument has merit. A partial satisfaction of a judgment or claim will not prevent enforcing a greater claim even though the amount received must be credited *pro tanto* against the amount ultimately collected. Prosser, *Handbook of the Law of Torts*, § 48 (5th ed. 1984); *Farrall v. A.C. & S. Co., Inc.*, Del.Super., 586 A.2d 662 (1990). As a practical matter, however, Furek's remaining claims against joint tortfeasors have been significantly limited on appeal, with the affirmance of judgments in favor of Sig Ep and the National Fraternity and the sustaining of the trial court's disallowance of punitive damages. The effect of our decision today is to leave Furek with the right to pursue a new trial only as to the University's liability, with the amount of compensatory damages fixed in the event he is successful.

■■■ The University argues that since Furek has recovered $29,900.00 of a $30,000.00 award of compensatory damages, an award not separately questioned, this Court should view the matter as substantially moot and refuse to order further proceedings under the legal maxim, *"de minimus non curat lex."* We note that a court may decline to order a remand to correct an insignificant error in damages. *Weingartner v. Bielak*, 142 Conn. 516, 115 A.2d 668 (1955). While we agree that Furek's ultimate recovery on remand may be limited, he has obligated himself to reim-

---

19. Section 6304(a) provides:

A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasor unless the release so provides; but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid.

burse Donchez for a substantial part of the settlement already received if Furek "obtains a new trial." Thus, Furek may be contractually required to avail himself of the new trial now granted. Since any retrial will necessarily require the jury to again reallocate fault between the University and Donchez, the cost of achieving that result when measured against the ultimate gain to Furek may prove unrealistic to all parties. Despite the apparent impracticality of a new trial, we decline to bar that result if Furek believes it is in his financial or contractual interests to pursue it.

### VIII

In summary, we affirm the rulings of the Superior Court which dismissed Furek's claim against Sig Ep, denied recovery of punitive damages and refused to grant a directed verdict on the defenses of contributory negligence and assumption of risk. We also affirm the jury's verdict in favor of the National Fraternity. We reverse and remand for a new trial, limited to the issue of liability, the Superior Court's grant of judgment n.o.v. in favor of the University.