# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DARRALYN BUFORD, | ) | |
| | ) | |
| Plaintiff, | ) | **C.A. No. K17C-08-031 NEP** |
| v. | ) | |
| | ) | |
| GREGORY E. LIGON, JR., | ) | |
| | ) | A CONSOLIDATION OF CASES: |
| Defendant/Third Party | ) | K17C-09-037: K17C-10-016; |
| Plaintiff, | ) | K17C-10-017; K17C-10-023; |
| v. | ) | N17C-10-261; N17C-10-262 |
| | ) | |
| DELAWARE STATE UNIVERSITY, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

Submitted:  September 30, 2021
Decided:  November 30, 2021

## OPINION AND ORDER

*Upon Defendant Delaware State University's Motion for Summary Judgment*
**DENIED IN PART and GRANTED IN PART**

**On the Briefs:**

Joseph J. Rhoades, Esquire, and Stephen T. Morrow, Esquire (argued), Rhoades & Morrow LLC, Wilmington, Delaware, *Attorneys for Plaintiff Shianta D. Moore.*

James D. Taylor, Jr., Esquire, (argued) and Charles E. Davis, Esquire, Saul Ewing Arnstein & Lehr LLP, Wilmington, Delaware, *Attorneys for Defendant/Third-Party Defendant Delaware State University.*

Shae Chasanov, Esquire (argued), Swartz Campbell LLC, Wilmington Delaware, *Attorney for Defendant/Third-Party Plaintiff Gregory E. Ligon, Jr.*

Primos, J.

Before this Court is a motion for summary judgment filed by Delaware State University (hereinafter "DSU"), one of the defendants in this consolidated action. The motion is opposed by the other defendant, Gregory E. Ligon, Jr. (hereinafter "Ligon"), and by three of the six plaintiffs. This matter arises from an incident on DSU's campus during its homecoming festivities in 2015. There are six plaintiffs: 1) Shianta D. Moore (hereinafter "Moore"); 2) Jovaughn McNeal (hereinafter "McNeal"); 3) Deoz'a Spriggs (hereinafter "Spriggs"); 4) Darralyn Buford; 5) the Estate of Joseph Hatton;[1] and 6) Melody Dale. Plaintiffs Moore, McNeal, and Spriggs (hereinafter collectively "Plaintiffs") are suing both Ligon and DSU.[2]

Following pre-trial discovery, DSU filed the instant motion. Moore filed a brief in opposition to the motion, as did Ligon. McNeal adopted selected arguments from both Moore's and Ligon's briefs.[3] Spriggs adopted Moore's brief in full and Ligon's brief in part.[4] For the reasons that follow, DSU's Motion for Summary Judgment is **DENIED IN PART** and **GRANTED IN PART.**

## I. FACTS

Viewing the events in the light most favorable to the non-moving parties, as this Court must in considering DSU's motion for summary judgment,[5] these are the relevant facts:

---

[1] The Estate was substituted for Mr. Hatton as a party on August 11, 2021.

[2] Darralyn Buford, Joseph Hatton, and Melody Dale did not sue DSU.

[3] McNeal adopted Ligon's answering brief regarding 1) "whether DSU owes a duty as a matter of law;" and 2) "whether Ligon's actions were a superseding cause of the subject collision." McNeal's Opposition to DSU's Mot. Sum. J. at 1-2. In addition, McNeal adopted Moore's Answering Brief regarding "whether Plaintiffs' [sic] have established sufficient facts to establish a punitive damage claim against Delaware State University." *Id.*

[4] Spriggs adopted "the statement of facts, authorities and arguments presented in the Answering Brief of [Moore], along with Arguments I and II (and the authorities referenced therein) presented in the Answering Brief of Defendant [Ligon]." Spriggs's Opposition to DSU's Mot. Sum. J. at 1.

[5] *See LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 191 (Del. 2009) (stating that on a motion for summary judgment "the facts of record, including any reasonable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party.").

## A. The October 24, 2015, Incident

Homecoming is an annual event hosted by DSU centered around a specific football game where students and alumni are invited by DSU to celebrate and socialize on DSU's campus. On October 24, 2015, Ligon, an alumnus of DSU, was a participant in the 2015 homecoming weekend (hereinafter "Homecoming"). DSU planned and organized this event for several weeks, setting up various activities and vendors to be held on campus.[6] One of the events DSU set up was an alumni social tent (hereinafter the "Alumni Tent").[7] The Alumni Tent was a place where students and alumni came together to drink and socialize before, among other things, going to an area known as the plots (hereinafter the " Plots") to eat, drink, and congregate.[8]

DSU is a "dry" campus. Ostensibly, neither possession nor consumption of alcohol is allowed on campus, no matter the age of the individual.[9] Delaware State University Police (hereinafter "DSUP") was responsible for the safety and security of students and visitors during Homecoming.[10] However, during Homecoming either DSUP did not enforce DSU's "dry campus" policy, or enforcement was not a high priority.[11] Students and alumni freely roamed campus, more specifically the

---

[6] DSU's App. Ex. 8, Homecoming Events and Staff Assignments (listing the "schedule of events and staff assignments for homecoming," provided in an email sent by the Assistant Vice President for Alumni Relations).

[7] *Id.* (specifically referring to the "Alumni Tent" as the location for an event).

[8] More than one of the plaintiffs visited the Alumni Tent before proceeding to the Plots.

[9] Pl. Moore's App. (hereinafter "Pl.'s App.") Ex. 6, Dep. Tr. of Sgt. Gregory Elliott, Jr. at 37 ("There's alcohol zero tolerance on campus . . . ."); Pl.'s App. Ex. 9, Dep. Tr. of Erinn Zirkle (DSU Police Patrolman) at 33 (stating that DSU is a "dry campus" and does not allow alcohol consumption by anyone, not just students).

[10] Pl.'s App. Ex. 6, Dep. Tr. of Sgt. Elliott at 68 (answering in the affirmative as to whether DSUP was responsible for the safety of visitors and students during homecoming).

[11] "I'm not being the alcohol police where—we have a number of people on campus that day and we're just managing our programs and the event during the day." Pl.'s App. Ex. 4, Dep. Tr. of Harry Downes (DSUP Chief) at 31. Downes went on to state that monitoring alcohol use at Homecoming was not a priority. *Id.* However, DSUP had issued drinking citations for students on the Plots on previous occasions. Pl.'s App. Ex. 6, Dep. Tr. of Sgt. Elliott at 37. In addition,

Plots and the Alumni Tent, with drinks in their hands.[12]  In addition, there were no DSUP officers assigned to the Plots during Homecoming,[13] or observed and assigned to "control vehicular traffic" around the Plots.[14]  Further, Harry Downes, Chief of DSUP, acknowledged that there was a Homecoming plan, although it could not be found, and that the Plots was not part of that plan.[15]

During Homecoming, Ligon was given a wristband and was served alcohol in the Alumni Tent.[16]  Ligon had several drinks.[17]  Thereafter, he got into his vehicle and drove to the Plots, which, as one plaintiff explained, is a normal thing to do.[18]  During prior homecomings DSU had provided courtesy shuttles to move people

Ligon stated, "It was a known thing [by students] you could openly just drink" in the Plots. Pl.'s App. Ex. 3, Dep. Tr. of Ligon at 140.

[12] Moore confirmed that a number of people were drinking in the Alumni Tent. Pl.'s App. Ex. 1, Dep. Tr. of Moore at 53.  She went on to say that people were consuming alcohol all around campus, even drinking directly from "bottles of liquor." *Id.*  When asked specifically about the Plots, she stated that people were drinking on the Plots and that "each sorority and fraternity [had] their own alcoholic beverage, like their own juices." *Id* at 54; *cf.* Pl.s App. Ex. 9,  Dep. Tr. of Zirkle at 33 (explaining that it would be a violation if people were consuming alcohol on the Plots).
[13] Downes stated "No, [there were] no [DSUP Officers] assigned to the Plots." Pl's. App. Ex. 4, Dep. Tr. of Downes at 119.
[14] *Id.*
[15] *Id.* at 104-105.
[16] For purposes of summary judgment, DSU concedes that it provided the alcohol in the Alumni Tent.  (Oral Argument, Sept. 30, 2021). This is consistent with multiple depositions. *See* Pl's App. Ex. 1, Dep.  Transcript of Moore at 53 (explaining that there were many people drinking at the Alumni Tent and "[t]hey had a bar set up"); Pl's App. Ex. 7, Dep. Tr. of  Kimani Robinson at 40 (answering "yes" to whether alcohol was served in the Alumni Tent); Pl's App. Ex. 8, Dep. Tr. of Donald Walker  at  33-34, 40 (stating that alcohol was served and consumed in the Alumni Tent and "everybody–or almost everybody is having some form or type of libations or whatever. It's just, it's just on the campus during [H]omecoming"); Ligon's App. Ex. 13, Dep. Tr. of McNeal at 12-13 (stating that he had to show his identification at the Alumni Tent and then was served alcoholic mixed drinks).
[17]  DSU's App Ex. 29, Dep. Tr. of Ligon at 26 (explaining that Ligon had several drinks from the Alumni Tent); Pl.'s App. Ex. 7, Robinson Dep. at 76 (indicating that Ligon appeared drunk when he initially got out of the car while it was moving backwards).
[18] Ligon's App. Ex. 13, Dep. Tr. of McNeal at 70 (explaining that "[s]ome people would drive around to where—the way that you could drive [to the Plots].  Some people would.").

4

around campus, but no such shuttles were used at Homecoming.[19]  On his way to the Plots, Ligon had unfettered access to the school through open gates, specifically gate III (hereinafter "Gate III").[20]  There was no security detail guarding the entrance to Gate III—one of the gates that led to the Plots—and there was no parking procedure for invitees of Homecoming that would direct participants, upon entering Gate III, to parking lots before gaining access to the end of University Drive, which bisects the Plots.[21]

The Plots is divided by University Drive.  University Drive ends at the backside of the Plots, and the bisecting road is "narrow and small."[22]  Further, "as far as moving cars and people in and out [of the Plots], when it becomes crowded, it becomes very confined."[23]  For years prior to Homecoming, parking was allowed in limited capacities along the Plots.[24]  On one side of the end of University Drive— still part of the Plots as a whole—was the Kappa Alpha Psi plot (hereinafter the "Kappa Plot"), a comparatively small, grassy fraternity area, but one of the most

---

[19]  DSU's App. Ex. 29, Dep. Tr. of Ligon at 240-241 (stating that DSU provided courtesy shuttles during homecoming from Defendant's "freshman year up until [his] last year").

[20] Ligon drove on Frontage Road, exited campus onto College Road, and then entered back into campus through Gate III. *See* Pl.'s App Ex. 3, Dep. Tr. of Ligon at 114-116.

[21] Pl.'s App. Ex. 3, Dep. Tr. of Ligon at 122-124 (explaining that he neither saw, nor had contact with, any DSUP officers on his way to the Plots); *accord* Pl.'s App. Ex. 7, Dep. Tr. of Robinson at 23 (answering "no" to whether he had observed "any barriers or gates or other measures used" to block vehicular traffic from the Plots). When answering whether there were "any gates or barriers that blocked vehicular traffic in and around the Plots area," Sgt. Elliott stated, "There was [sic] no barriers." Pl's App. Ex. 6, Dep. Tr. of Sgt. Elliott at 42.  Gate III gives access to campus from College Road, and according to emails between DSU employees, "that road is typically blocked by campus police."  DSU's App. Ex. 19, Traffic Restrictions During Events.  Further, it was typical to have an officer stationed "at each gate" (referring to Gate I, II, III) to direct the traffic. Pl.'s App. Ex. 6, Dep. Tr. of Sgt. Elliott at 74.

[22] Pl.'s App. Ex. 10, Dep. Tr. of Cpt. Kevin Kober at 35.

[23] *Id.* at 57-58.

[24] *Id.* at 34-36 (stating that DSU was aware that there "have been cars back in [the Plots] over the years," as "security had to get the cars out of the [Plots on previous occasions] because it's . . . a confined space").

popular.[25]  Because of the small size of the Kappa Plot, people would typically stand on the Kappa Plot and on the "street side."[26]  On the other side of University Drive there was a large grassy area consisting of all the other  organizations' designated plots.

During Homecoming, as with past homecomings, it was a known fact and "tradition" that the Plots was the place to gather after the football game.[27]  Numerous individuals converged on the Plots after the game, and this put "way too many people" into one area:[28] people gathered on the Plots by at least the hundreds and perhaps the thousands.[29]  In addition, participants assembled on University Drive, either crossing from one side (the Kappa Plot) to the other, or standing on the road to converse.[30]  There were multiple vehicles parked around the Plots during

---

[25] Pl's App. Ex. 7, Dep. Tr. of Robinson at 18 ("[T]he Kappa plot is one of the more popular so we also have people on our plot.  Because our plot is not that big, though, we have [people] on the grass area as well as on the street side.").

[26] *Id.*

[27] *Id.* at 29 (explaining that students who were not associated with Greek organizations knew to come to the Plots during and after the football game because it was "[t]radition"); accord Pl's App. Ex. 3, Dep. Tr. of Ligon at 28 ("[B]ecause that's where everyone goes after the football game. . . . It's tradition. Students, teachers, alumni, fraternities, [and] sororities.")

[28] Pl.'s App. Ex. 8, Dep. Tr. of Walker at 23; *see also id.* at 21 (describing the Plots "as the only place to be . . . . That's where everybody is.  I mean it's homecoming; the game's over; so everybody converges on the Plots to have a great time until we decide to go home.").

[29] It is undisputed there were a substantial amount of people at the Plots.  The exact number varies depending upon the individual providing testimony. *See* Ligon's Answering Br. at 3 (pointing out the varying answers about the number of people on the Plots during Homecoming ranging from the hundreds to the thousands); *Pl.*'s App. Ex. 9, Dep. Tr. of Zirkle at 28 (stating that a "couple hundred . . . sounds pretty accurate").

[30] Pl's. App. Ex. 7, Dep. Tr. of Robinson at 20 (indicating that people would typically be standing on University Drive between the two plot areas "traveling back and forth from the large grass, which is where other Greek organizations are, and [the Kappa Plot]").  Robinson went on to state that "the majority [of people] are was [sic], again, on [the Kappa] [P]lot, the street and the other grassy area." *Id.* at 54.  Upon final questioning on the topic, he stated that not only would some people be crossing the street, but others would be standing on the street for the sole purpose of talking. *Id.* at 69.

6

Homecoming,[31] and there were even some vehicles parked directly on the grassy area itself.[32] Parking in the Plots on both the grassy area and the street had been allowed "over the years."[33]

Upon entering the Plots, Ligon attempted to park alongside the Plots near people standing on University Drive.[34] The spot he chose had "little white marks" that designated it as an official parking spot.[35] Ligon was attempting to parallel park in between other vehicles parked in front of him and/or behind him[36] and a group of people standing near the spot he wanted.[37] When Ligon got halfway into the spot,[38] he noticed the people immediately behind him through his rearview mirror, and, while in reverse, he got out of his car to tell the people near the spot to move away.[39] When he realized that his car had not stopped and was still going in reverse,[40] he

---

[31] Pl's. App. Ex. 8, Dep. Tr. of Walker at 29 (confirming that there were multiple vehicles parked on University Drive close to where Ligon attempted to park).

[32] The video exhibit provided by DSU shows the Plots at the time of the incident. It appears from the video that two vehicles are in the middle of the Plots, with another three vehicles on the right side in the grassy area. *See* DSU's App. Ex. 38. Further, the video shows vehicles parked around the Plots. *Id.* Ligon testified that there were typically vehicles parked on the grassy area itself, including on Homecoming, and trucks would hop over the curb to get onto the Plots. Pl's App. Ex. 3, Dep. Tr. of Ligon at 244-45. Additionally, Captain Kober testified that he saw vehicles on the grassy area of the Plots when he arrived on the scene of the incident. Pl.'s App. Ex. 10, Dep. Tr. of Cpt. Kober at 63.

[33] Pl.'s App. Ex 10, Dep. Tr. of Cpt. Kober at 34-36.

[34] Pl's App. Ex. 3, Dep. Tr. of Ligon at 42.

[35] *Id.* at 34.

[36] Ligon testified that he "believes" there was a car in front but not behind. *Id.* at 38. Walker testified, "I know there was a car directly behind [Ligon]. Initially I thought that there was a car in front of him. But after I thought about it a little more there wasn't a car in front of him." Pl.'s App. Ex. 8, Dep. Tr. of Walker at 29-30. In either scenario, there were other vehicles parked near Ligon.

[37] Pl's App. Ex. 3, Dep. Tr. of Ligon at 37-39.

[38] *Id.* at 44 (noting that his "car was at an angle" and he was "cutting the wheel" to get into the spot).

[39] *Id.* at 45-46; *accord* Pl.'s App. Ex. 8, Dep. Tr. of Walker at 29 ("[B]ecause he was trying to back in that spot and people were standing there, and that's when he tried to tell people, I guess, to move.").

[40] Ligon claims that he relied on a safety feature of his car that would allegedly stop it automatically. In his criminal trial, this Court found such reliance to be "negligent." DSU's App.

7

jumped back in. Instead of pressing the brake, Ligon accidently pressed the gas and drove up a curb onto the Plots, eventually reaching an approximate speed of 25 miles per hour.[41]

Ligon's car injured multiple people—most severely Moore by pinning her against a tree.[42] Ligon alleges that he was knocked out by his steering wheel and lost consciousness during "the four or five second[]" drive.[43] Paramedics arrived on scene but were "substantial[ly]" delayed because of the "concert"-like scene of the Plots.[44]

## B. Prior Shooting Incident-April 2015

A shooting incident had occurred on the Plots in April 2015, only a few months prior to Homecoming. Stacy Downing, DSU's Vice President for Student Affairs at the time of Homecoming, answered in the affirmative when asked whether the shooting was "due to people gathering on the Plots."[45] Kimani Robinson, a fraternity member at the time of the shooting, indicated that there were "[a] couple hundred" people on the Plots before the shots went off.[46] In response to the shooting, DSU closed the Plots for several months.[47] Downing recalls putting "restrictions on what could happen in that area as far as sanctioned student activities . . . until [there

---

Ex. 44, Crim. Trial Tr. at C-44 ("Mr. Ligon's reliance upon the automatic safety feature was itself a negligent reliance.").

[41] DSU's App. Ex. 36, Expert Rep. of John D. Struble at 31.

[42] Ligon's car door was open while he was in reverse. Moore was caught by the driver's side door and was wedged between the door and a tree. *See* DSU's App. Ex. 32, Dep. Tr. of Reconstructionist Corporal Brian Wood at 34.

[43] DSU's App. Ex. 44, Crim. Trial Tr. at C-45.

[44] Pl.'s App. Ex. 2, Dep. Tr. of Michelle Zaffora at 14, 36-37 ("So there's a five minute lag in patient care with me arriving on the scene and me getting to the patient, which is a substantial gap. We're usually able to get to people within a minute or two. I would say there was some kind of entry challenge . . . [of] people . . .[r]efusing to move.").

[45] Pl.'s App. Ex. 5, Dep. Tr. of Stacy Downing at 57-58.

[46] Pl's. App. Ex. 7, Dep. Tr. of Robinson at 74.

[47] Pl.'s App. Ex. 5, Dep. Tr. of Downing at 94-95.

was] time to talk about, again, recap what we could do to improve events in that area.["48] There was an analysis of whether the activities held on the Plots were "safe."[49] However, because Homecoming was an "informal event where people do gather," not a "sanctioned student event[]," it did not "fall under the parameters" of the alleged new policies arising from the shooting and the restrictions were not put in place," [50] despite the fact, as Downing acknowledged, that Homecoming was an "event [that] brings[] hundreds of alum [sic] on campus to gather in a certain place."[51]

The Plots had been an area of focus for DSUP prior to Homecoming: one DSUP officer stated, "There have been, you know, times where there's [sic] been fights on the Plots area."[52] With regard to the campus generally, another DSUP officer stated, "There may have been a minor one [vehicle-on-pedestrian accident during a prior homecoming] in other parts of the parking lot or things like that. Nothing to [this] level . . . [and] scale."[53]

## II. PROCEDURAL HISTORY

Ligon faced criminal charges of vehicular assault and driving under the influence (DUI) relating to his actions during Homecoming. Prior to the criminal trial, which was held in December 2016, the vehicular assault charges were re-indicted from charges requiring criminal negligence to charges requiring the lesser standard of ordinary negligence. [54] Ligon provided sworn testimony during the

---

[48] *Id.* at 95.
[49] *Id.* at 98.
[50] *Id.* at 99.
[51] *Id.* at 99-100.
[52] Pl.'s App. Ex. 6, Dep. Tr. of Sgt. Elliott at 53.
[53] Pl.'s App. Ex. 10, Dep. Tr. of Cpt. Kober at 69.
[54] Both degrees of vehicular assault, as re-indicted, required proof of ordinary negligence rather than criminal negligence. *See State v. Ligon*, 2016 WL 4375251, at *2 (Del. Super. Aug. 12, 2016) ("The statutory burden for Vehicular Assault in the First Degree requires the State to prove DUI, negligence, and serious physical injury. Vehicular Assault in the Second Degree contains different

9

criminal trial, which lasted three days, from December 6 to December 8, 2016.[55] This Court found Ligon guilty of one count of first-degree vehicular assault, four counts of second-degree vehicular assault, and DUI.[56]

The six plaintiffs in this case filed their respective complaints in the second half of 2017.[57] On July 19, 2018, all cases were consolidated for purposes of discovery, liability, and damages, without prejudice for any party to move at a later date to bifurcate trials on damages.

As noted previously, only Moore, McNeal, and Spriggs filed direct claims against DSU, but DSU is a party to all of the individual actions through Ligon's claims against DSU for contribution and indemnification (*i.e.*, either cross-claims or third-party claims as appropriate).[58]

The Court heard oral argument on DSU's motion for summary judgment on September 30, 2021.

### III. PARTIES' CONTENTIONS

DSU advances two main arguments with respect to whether DSU is liable for Plaintiffs' injuries. The first is that this incident was not foreseeable to DSU as a matter of law. The second is that Ligon's actions were a superseding cause, thereby eliminating any of DSU's potential negligence as a factor resulting in Plaintiffs'

---

burdens of proof depending on whether alcohol is a factor. Counsel for Ligon was aware that the State was charging Ligon with DUI, should have been aware of the statutory provisions in 11 *Del C.* § 628A, and thus should have been prepared for a possible re-indictment based on the alcohol factor.").

[55] *See generally* DSU's App. Ex. 36 (listing the witnesses who testified, provided written statements, and gave depositions for the criminal trial).

[56] DSU's App. Ex. 44, Crim. Trial Tr. at C-46.

[57] The filing dates of the complaints are as follows: Spriggs, 10/18/2017; McNeal, 10/12/2017; Moore, 10/20/2017; Melody Dale, 10/12/2017; Joseph Hatton, 09/28/2017; Darralyn Buford, 8/28/2017.

[58] Ligon and DSU also filed third-party claims and/or cross-claims against Mercedes-Benz USA, LLC, which have since been dismissed with prejudice.

injuries. Both Moore and Ligon argue that foreseeability is a question that should be left for a jury, including whether Ligon's actions were a superseding cause.

DSU also contends that any contract claims against it regarding this case should be dropped.[59] In addition, DSU argues that Ligon should be precluded from litigating his negligence, as this Court found it as one of the elements of his criminal charges.[60] Lastly, DSU argues that if this Court denies summary judgment as to Plaintiffs' negligence claims against it, then the Court should find that punitive damages are not warranted in this case as a matter of law.[61]

## IV. STANDARD OF REVIEW

Generally, when reviewing a motion for summary judgment pursuant to Delaware Superior Court Civil Rule 56, the Court must determine whether any genuine issues of material fact exist.[62] The moving party bears the initial burden of showing that there are no genuine issues of material fact; when such a showing is supported in the motion, the burden then shifts to the nonmoving party to show that there are material issues of fact in dispute.[63] Further, the Court must draw all factual inferences in a light most favorable to the non-moving party.[64] Therefore, summary judgment will not be granted if it appears that there are material facts in dispute or

---

[59] Only Moore and Spriggs had contract claims against DSU. Moore has dropped her contract claim, as noted in her Answering Brief, which was adopted in full by Spriggs. Moore's Answering Br. at 31.

[60] Moore and McNeal (by adoption of Moore's Answering Brief) also argue that Ligon should be collaterally estopped from raising the issue of negligence during this civil litigation. Ligon in essence concedes to the preclusion, but argues that he should have the opportunity to present to a jury his reliance on his vehicle's alleged safety feature to allow the jury to weigh the extent of his negligence as to any finding of potential punitive damages against him, as discussed *infra.*

[61] Moore, and both McNeal and Spriggs (by adoption), argue that punitive damages should not be precluded as a matter of law because "DSU did not just make an error in judgment in ignoring [t]he Plots security but displayed a conscious indifference to the safety of homecoming the attendees [sic] in [t]he Plots." Moore's Answering Br. at 34.

[62] Super. Ct. Civ. R. 56(c); *Wilmington Trust Co. v. Aetna*, 690 A.2d 914, 916 (Del. 1996).

[63] *Moore v. Sizemore*, 405 A.2d 679, 681 (Del. 1979).

[64] *Alabi v. DHL Airways, Inc.*, 583 A.2d 1358, 1361 (Del. 1990); *Merrill v. Crothall-Am., Inc.,* 606 A.2d 96, 100 (Del. 1992).

11

that further inquiry into the facts would be appropriate "in order to clarify the application of the law to the circumstances."[65]

## V. DISCUSSION

### A. DSU Is Not Entitled to Summary Judgment on Plaintiffs' Negligence Claims.

#### 1. DSU owed a duty to Plaintiffs under both Section 323(a) and Section 344 of the Restatement (Second) of Torts.

In determining whether DSU is entitled to summary judgment on Plaintiff's negligence claims, the first step is to ascertain what duty, if any, DSU owed Plaintiffs. Questions of duty are for the Court to decide.[66] Here, there are two theories of duty that may be actionable by Plaintiffs, which were similarly found in *Furek v. Univ. of Delaware.*[67] They fall under Section 323 and Section 344 of the Restatement (Second) of Torts (1965).[68] This Court will examine each one in turn.

#### a. Section 323 of the Restatement (Second) of Torts (1965)

Restatement § 323 provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
> > (a) his failure to exercise such care increases the risk of such harm, or
> > (b) the harm is suffered because of the other's reliance upon the undertaking.[69]

---

[65] *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962).

[66] *See Naidu v. Laird*, 539 A.2d 1064, 1070 (Del. 1988) ("[D]etermining the existence and parameters of a duty is a question of law . . . .").

[67] 594 A.2d 506, 520, 521 (Del. 1991); see *also Marshall v. Univ. of Del.*, 633 A.2d 370, 1993 WL 385114, at *1 (Del. 1993) ("In *Furek* the circumstances supported a claim under Restatement of Torts 2d § 323 and under a landlord-invitee relationship.").

[68] Restatement (Second) of Torts § 323 (1965); Restatement (Second) of Torts § 344 (1965).

[69] Restatement (Second) of Torts § 323 (1965).

Section 323 "addresses the duty owed by one who assumes direct responsibility for the safety of another through the rendering of services in the area of protection."[70] If one "takes charge and control of [a] situation, he is regarded as entering into a relation which is attenuated with responsibility."[71] Section 323 addresses only the duty of care to a person physically on the property of the entity owing the duty.[72] The Delaware Supreme Court found in *Jardel Co., Inc. v. Hughes*[73] that the mall owner, "having undertaken to provide a security program, albeit voluntarily, was obligated to perform the task in a reasonable manner with a view toward the dangers to which the program was directed."[74]

Here, there is no dispute that the Plots was the property of DSU and under its control. DSU offered security services for Homecoming. The safety of DSU's visitors and students participating in the festivities of Homecoming was acknowledged by DSU.[75] As the Vice President for Student Affairs and supervisor of DSUP stated, "I know we worked with different agencies to make sure we had enough patrol police officers in that area to maintain a level of safety. Again, that area [the Plots] is known to be a gathering place . . . ."[76]

DSU owed a duty to its visitors under Section 323 "[t]o perform the task [of security] in a reasonable manner with a view toward the dangers to which the program was directed." Moreover, DSU has acknowledged that the Plots deserved some attention during Homecoming.

---

[70] *Furek*, 594 A.2d at 520.

[71] *Id.*

[72] *Rogers v. Christina Sch. Dist.*, 73 A.3d 1, 9 (Del. 2013).

[73] 523 A.2d 518 (Del. 1987).

[74] *Id.* at 524.

[75] Dep. Tr. of Sgt. Elliott at 68 (answering in the affirmative as to whether DSUP was responsible for the safety of visitors and students during homecoming).

[76] Pl.'s App. Ex. 5, Dep. Tr. of Downing at 57.

More recently, in *Rogers v. Christina School District*,[77] the Delaware Supreme Court found that in order to establish liability under Section 323, the plaintiff must show an affirmative action that increases the chance of injury.[78] However, *Furek* recognized, when discussing *Jardel*, that when a **"**property owner has attempted to provide security or regulate a hazardous activity," that action is an "affirmative action" and "recognition that the potential for harm exists on the premises."[79]   DSU's affirmative action to provide security in an unreasonably limited way in the Plots could be found to have increased the risk of harm to DSU's Homecoming invitees on the Plots. Hence, the Court finds a duty under Section 323(a).

The Court finds the record devoid of any evidence of harm suffered by Plaintiffs due to their reliance upon the undertaking of DSU to provide security for the event.  Therefore, the Court does not find a duty under Section 323(b).

**b. Section 344 of the Restatement (Second) of Torts (1965)**

Restatement § 344 states:

> A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to
>> (a) discover that such acts are being done or are likely to be done, or
>> (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.[80]

---

[77] 73 A.3d 1 (Del. 2013).

[78] *Id.* at 10 ("Here, the School adopted a Protocol for how to handle students who express some suicidal intent. Finney took no 'affirmative action . . . [which] increased the risk of self-harm.'" (quoting *Jain v. State*, 617 N.W.2d 293, 299 (Iowa 2000))).

[79] *Furek*, 594 A.2d at 521-22.

[80]  Restatement (Second) of Torts § 344 (1965).

Here, DSU concedes that it has a duty under landowner-invitee premise liability.[81]  Therefore the Court need not discuss this duty any further, other than to find, under landowner-invitee premise liability, that a duty existed to both students and on-campus visitors during Homecoming in accordance with Restatement § 344.[82]

### 2. Foreseeability is a question that should be left for the jury in this matter.

In determining whether to grant summary judgment to DSU on Plaintiff's negligence claims, the Court must next consider the issue of foreseeability.  The Court is asked by DSU to weigh the evidence and determine that this incident was not foreseeable to DSU as a matter of law.  DSU argues that, to so find, this Court should either look at this case through the lens of so-called "curb-jumping" cases, or determine that DSU could not have foreseen the possibility of harm because there were no prior similar incidents.

### a. "Curb-Jumping" Cases

DSU would like the Court to consider this case under the more narrowly defined perspective of "curb-jumping" cases.  It relies upon two Delaware Superior Court opinions that found on summary judgment that business owners did not owe a duty to their invitees.

In *Achtermann v. Bussard*,[83] the plaintiff was dining in a restaurant when the defendant drove her vehicle through the parking lot, over a curb, across the sidewalk,

---

[81] *See* DSU's Opening Br. in Support of Mot. Sum. J. at 1 ("DSU acknowledges that a university (as does any landowner) generally owes a duty to its invitees.").

[82] *See Furek*, 594 A.2d at 520 ("A landowner who knows or should know of an unreasonably dangerous condition or use of his property has a duty to invitees to safeguard the invitee against such hazards including the conduct of third parties.").

[83] 2007 WL 901642, at *1 (Del. Super. Mar. 22, 2007), *aff'd sub nom. Achtermann v. Warrington*, 957 A.2d 1 (Del. 2008) (TABLE).

15

and through the front of the building, injuring the plaintiff.[84] The evidence presented indicated that there had been no prior accidents and that the curb was two and three-quarter inches high. The Superior Court found that although "Delaware cases . . . hold generally that foreseeability is usually a question for the jury, under the circumstances of this case, this Court holds that the accident that occurred was not foreseeable as a matter of law."[85]

Similarly, in *Britt v. V.H.S. Realty, Inc*,[86] the defendant's vehicle crashed through the store front while plaintiff was shopping inside.[87] There was no evidence of prior incidents involving vehicles crashing into the store.[88] The court held that, even considering the facts in a light most favorable to the plaintiff, the defendants were entitled to summary judgment because "[I]n this case, not only is there no evidence of any prior incidents involving vehicles crashing into the store, but the parking lot in question had 'parking stops' in place *and* a curb to protect invitees from potential 'errant vehicles.'"[89]

Additionally, DSU relies heavily on *Kusmirek v. MGM Grand Hotel, Inc.*,[90] a Ninth Circuit case that involved a plaintiff who was a visitor to the defendant's resort and who sued the defendant following an accident in the resort's valet parking area during which the plaintiff was hit by a car driven by a third party.[91] In determining that the defendant owed no duty to the plaintiff, the court relied on the fact that "[no] reasons [were given] why MGM should have reasonably anticipated that the

---

[84] *Id.* at *1.
[85] *Id.* at *3.
[86] 2010 WL 4397050, at *1 (Del. Super. Oct. 29, 2010).
[87] *Id.* at *1.
[88] *Id. at* *2.
[89] *Id.* (emphasis in original).
[90] 7 F. App'x 734, 735 (9th Cir. 2001).
[91] *Id.*

16

negligent conduct of third parties would likely to [sic] endanger the safety of visitors . . . ."[92]

Here, however, both the function of the curb along University Drive and the character of the Plots distinguish this case from those referenced *supra*. First, the function of the curb alongside University Drive differs from that of a curb next to a store front. It was a known fact on campus that individuals would jump the curb and park directly on the grass during many different types of events.[93] This also occurred during Homecoming.[94] Thus, the curb as a barrier to entry into the grassy area did not, in practice, serve to "protect invitees from potential 'errant vehicles.'"[95]

Second, the character of the Plots during Homecoming was more akin to that of a parade during which roads should be blocked off, rather than a store front where invitees would be inside shopping or eating. For illustration, participants at Homecoming stood on the street, University Drive, that bisected the Plots, not just for the purposes of crossing from one plot to another, but to talk and socialize with other students and alumni.[96] Consequently, the street was an extension of the Plots, and the participants of Homecoming saw it as such. This point is amplified by DSUP's own officer, Captain Kober, who described the part of University Drive that bisected the Plots as "narrow and small."[97] When asked whether vehicular traffic in the Plots created a pedestrian risk, he answered, "[i]f you have no real defined space for parking and no real defined space for pedestrians, it's just a mixture, yeah, you're much more likely to have an accident . . . . But there was . . . no rhyme or reason to where the cars were parking . . . . [C]ars . . . just seemed to be parked

---

[92] *Id.* at 736.
[93] Pl's App. Ex. 3, Dep. Tr. of Ligon at 244-45.
[94] *Id.*
[95] *Britt*, 2010 WL 4397050, at *2.
[96] Pl's. App. Ex. 7, Dep. Tr. of Robinson at 69.
[97] Pl.'s App. Ex. 10, Dep. Tr. of Cpt. Kober at 35.

where they saw a spot and pulled in."[98] Hence, the classification of the road as separate from the Plots is a misnomer.

Therefore, this case is not as clear as *MGM*, *Britt*, *and Achtermann* with respect to foreseeability of injury. Specifically, DSU's knowledge of the Plots in general, and Homecoming in particular, lends weight to the concept that allowing vehicles unfettered access to a place on campus where people commonly stood on the road and near the curb in large numbers foreseeably ran the risk of injury to one or more of these people.

Notably, "curb-jumping" cases have gone to the jury on the issue of foreseeability when the landowner had knowledge of prior instances of curb jumping in that area.[99] In this case, viewing the facts in a light most favorable to the non-moving parties, vehicles would jump the curb for prior events at DSU and drive onto the grassy area. DSU was aware of this fact for years prior to Homecoming.[100]

Another category of curb-jumping cases where foreseeability has been deemed a jury question is when the design of the building requires invitees to stand near the curb, *i.e.*, "to await service by standing adjacent to a parking lot or driveway" so that "if a car jumped the curb, there was a high likelihood that a pedestrian would be at the location."[101] This Court finds that both the design and the use of the Plots increased the likelihood of injury to those on the street and on the grassy area. During events such as Homecoming, people would stand near the curb and on the street in such density that if a car were to jump a curb, injury was nearly guaranteed. DSU argues that because it took a number of seconds for the car to reach Plaintiffs, the duty analysis is more tenuous. The Court disagrees. There

---

[98] Pl.'s App. Ex 10, Dep. Tr. of Cpt. Kevin Kober at 64-65.
[99] *E.g.*, *Jefferson v. Qwik Korner Mkt., Inc.*, 34 Cal. Rptr. 2d 171, 174 (Cal. Ct. App. 1994).
[100] Pl.'s App. Ex 10, Dep. Tr. of Cpt. Kober at 34-36.
[101] *Jefferson,* 34 Cal. Rptr. 2d at 174.

18

is at least a jury question as to whether several seconds—four or five—would not allow evasive action by participants of Homecoming on the Plots, especially given the density of people in the area.[102]

In short, without determining whether this case falls into the line of "curb-jumping" cases, the Court finds that even if it were to do so, the foreseeability question should be left for the jury.[103]

### b. Lack of Prior Incidents

DSU next argues that there were no prior incidents of this kind—specifically a vehicle's hitting a pedestrian in the Plots—to put DSU on notice, and hence the Court should find that this incident was not foreseeable as a matter of law.

This court is mindful that, while foreseeability may be found as a matter of law, the Delaware Supreme Court has at least twice reversed this Court when it "weighed facts regarding foreseeability."[104]

In *Peterson*, an invitee of The Touchdown Lounge was assaulted by two other patrons. The plaintiff argued to the trial court that judgment as a matter of law was "inappropriate in this case because the issue of forseeability [sic] is a jury

---

[102] *See Robison v. Six Flags Theme Parks, Inc.,* 75 Cal. Rptr. 2d 838, 843 (Cal. Ct. App. 1998) (holding that two seconds is "too short a time to allow for reliable evasive action by an unsuspecting person seated at a picnic table, possibly with his or her back to the oncoming car.").

[103] *See id.* at 846 ("Conduct is negligent where some unreasonable risk of danger to others would have been foreseen by a reasonable person. The general danger of a car hitting unsuspecting picnickers in the picnic area Magic Mountain placed in its parking lot was foreseeable, and Magic Mountain's focus on the specific circumstances under which the developmentally disabled woman lost control of this car in this particular instance is misplaced. When an unreasonable risk of danger exists, the landowner bears a duty to protect against the first occurrence, and cannot withhold precautionary measures until after the danger has come to fruition in an injury-causing accident.").

[104] *See Peterson v. Del. Food Corp.*, 788 A.2d 132, 2001 WL 1586831, at *2 (Del. Dec. 6, 2001) (TABLE) ("[I]t is improper for the trial judge to weigh the facts. . . The trial judge should have submitted the factual issues relating to foreseeability to the jury." (internal quotations and citations omitted)); *Rogers v. Del. State Univ.*, 905 A.2d 747, 2006 WL 2085460, at *2 (Del. July 25, 2006) (TABLE) ("Here, the Superior Court weighed facts regarding foreseeability that it should have submitted to a jury. Because material issues of fact exist in this case, the summary judgment in favor of DSU on the issue of foreseeability must be reversed.").

question."[105]  However, the trial court found that the assault was "unprovoked" and "occurred suddenly" and therefore that the "instantaneous nature of the attack [was] such that . . . [it] could not have [been] foreseen."[106]  On appeal, the Supreme Court held that "the trial judge erred when he removed from the jury the factual issues relating to foreseeability."[107]  The Supreme Court further stated that in focusing on the "unprovoked" nature of the attack, the trial judge erred in "weigh[ing] the facts" against other altercations that had occurred at the lounge.[108]

In *Rogers*, DSU provided students housing at Dover Inn due to an overflow of students in its on-campus housing facilities.  The plaintiff, Rogers, was one of the students being housed in Dover Inn. One night, Rogers was sitting in his car in the parking lot of Dover Inn and was shot, sustaining serious injuries.  The record showed that DSU had provided no security measures for students housed at Dover Inn.[109]  The trial court found that "DSU cannot be held liable for the unforeseeable targeted attack" by the shooter, because "an attack of this sort, vindicating a personal vendetta, is not one generally deterred by security patrols."[110]  In further explanation, the trial court found the strange circumstances of the attack to suffice as a superseding, intervening cause.[111]  On appeal, the Supreme Court reversed in part, holding that there were material facts in dispute in the case, most notably whether

---

[105] *Peterson v. Del. Food Corp.*, 2000 WL 33157796, at *2 (Del. Super. Dec. 28, 2000), *rev'd*, 788 A.2d 132 (Del. 2001).
[106] *Id.* at *3.
[107] *Peterson*, 2001 WL 1586831, at *1.
[108] *Id.* at *2.
[109] *Rogers*, 2006 WL 2085460, at *2 ("DSU did not conduct any security risk assessment of Dover Inn before placing students there and did not provide any security measures, orientation or training for the students who lived there.")
[110] *Rogers v. Del. State Univ*., 2005 WL 2462271, at *7 (Del. Super. Oct. 5, 2005), *aff'd in part, rev'd in part*, 905 A.2d 747 (Del. 2006).
[111] *See id.* ("The attack in this case was planned and targeted, the result of a jealous ex-boyfriend, and, as such, constitutes an intervening, superceding [sic] cause.").

"the failure of DSU to follow usual and customary student safety and security measures was a proximate cause of Rogers' [sic] injuries."[112]

Through both *Peterson* and *Rogers*, the Supreme Court relayed one underlying principle on the issue of foreseeability: "questions of foreseeability are jury questions and the *unique characteristics* of the particular [incident] should not be considered over other facts."[113]

Comment (f) of Section 344 is particularly relevant in weighing foreseeability in this case:[114]

> *f. Duty to police premises.* Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, **even though he has no reason to expect it on the part of any particular individual**. If the **place or character of his business**, or his **past experience**, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.[115]

*Jardel* recognized that "application of the principle of foreseeability to claims based on nonfeasance—here not anticipating acts of third parties—may prove difficult."[116] However, "where the property owner has attempted to provide security or regulate a hazardous activity . . . [there is] at least tacit recognition that the potential for harm exists on the premises."[117]  In addition, "[c]rimes of whatever type and whenever

---

[112] *Rogers*, 2006 WL 2085460, at *2.

[113] *Id.* (citing *Peterson*, 2001 WL 1586831, at *2) (emphasis supplied).

[114] *Furek.*, 594 A.2d at 521.

[115] *Id. (*quoting Restatement (Second) of Torts § 344 cm. f (1965)) (emphasis supplied).

[116] *Jardel*, 523 A.2d at 525 (citations omitted).

[117] *Furek*, 594 A.2d at 522.

occurring on the premises are part of the circumstantial setting in which security needs are measured."[118]

With regard to *MGM*, upon which DSU relies heavily, the Court of Appeals for the Ninth Circuit stated that plaintiff "does not cite to any evidence that a hotel's valet service is a type of business that would reasonably anticipate careless behavior of third persons."[119] Here, by contrast, there are a number of facts cited by the non-moving parties showing why DSU should have reasonably anticipated careless behavior of third parties during Homecoming at the Plots. These include, but are not limited to: 1) DSU was aware that a large number of people would gather on the Plots during Homecoming;[120] 2) DSU provided, or allowed, alcohol to be consumed by adults of legal age who would end up on the Plots after visiting the Alumni Tent, and allowed as well drinking by both underage and of-age students on the Plots during Homecoming, despite DSU's "dry campus" policy;[121] 3) DSU was aware that vehicles would often park in the Plots, including on the grassy area;[122] 4) DSU was aware that the Plots was a confined, "narrow" space in which vehicles maneuvered

---

[118] *Jardel* at 526 (citations omitted).

[119] *MGM*, 7 F. App'x at 736.

[120] *See* Pl.'s App. Ex. 5, Dep. Tr. of Downing at 94-95.

[121] Ligon was served alcohol as a business invitee on DSU's campus. Whether DSU itself provided alcohol to Ligon in the Alumni Tent is not determinative of the issue of DSU's negligence and liability. DSU had a duty to its invitees to protect them from dangerous conditions. The Supreme Court of Delaware noted in *DiOssi v. Maroney* that there is "ample decisional support elsewhere" affirming the concept that the danger posed by the conduct of third parties includes the acts of intoxicated individuals. 548 A.2d 1361, 1366 (Del. 1988); *see also Furek*, 594 A.2d at 520 ("A landowner who knows or should know of an unreasonably dangerous condition or use of his property has a duty to invitees to safeguard the invitee against such hazards including the conduct of third parties."). With respect to DSU's security planning for Homecoming, alcohol consumption was a known condition present on campus during Homecoming that DSU consciously decided to address lightly, if at all, notwithstanding the fact that DSU's own "dry campus" policy prohibited consumption by anyone. In short, the presence of alcohol on campus was a condition that DSU had a duty to evaluate when assessing its security measures for Homecoming.

[122] *See* Pl.'s App. Ex 10, Dep. Tr. of Cpt. Kober at 34-36.

during Homecoming;[123] 5) DSU was aware that altercations had occurred on the Plots during past events due to the large crowds that would gather;[124] and 6) DSU was aware that a shooting had occurred on the Plots only months before.[125] For purposes of the analysis, the "type of business"[126] can equate more fairly in this scenario to a large catered party where the activities at the Plots were the "main event" and security was limited or even non-existent.

DSU was responsible for controlling traffic and vehicular access to campus as part of its security program during Homecoming. DSUP employed several methods, such as a metal fence and its own police vehicles, to inhibit traffic from reaching different parts of the campus for a variety of reasons, including protecting pedestrians.[127] Moreover, by providing security DSU was acknowledging that "the potential for harm exist[ed]."[128] As stated *supra*, DSUP officers, such as Captain Kober, understood the risk to pedestrians in the Plots.[129] In addition, the prior shooting incident, which occurred on the Plots only a few months prior to

---

[123] *See* Pl.'s App. Ex. 10, Dep. Tr. of Cpt. Kevin Kober at 35, 64.

[124] Pl.'s App. Ex. 6, Dep. Tr. of Sgt. Elliott at 53.

[125] *See* Pl.'s App. Ex. 5, Dep. Tr. of Downing at 57-58.

[126] *MGM*, 7 F. App'x at 736.

[127] Pl.'s App. Ex. 4, Dep. Tr. of Downes at 86-87 (recalling using metal barricades as traffic control devices at DSU football games to direct motor vehicles to park in certain lots); see Pl.'s App. Ex. 1, Dep. Tr. of Moore at 88-89 (recalling seeing traffic control devices blocking off certain parts of campus from vehicles during Homecoming). *See also* Pl.'s Ex. 11, Expert Rep. of Russell Kolins at 24 ("On the evening in question, there were multiple locations and opportunities where vehicular traffic could have been stopped or redirected by use of gates or use of other physical barriers which were being utilized by the University in other parts of the campus. Yet, the University failed to employ any plan to prohibit vehicular traffic in the area of the Plots.").

[128] *Furek*, 594 A.2d at 522.

[129] Captain Kober explained that in any big event, whether "Nascar or Firefly . . . you always have—you try to eliminate having [vehicles and pedestrians] together the best you can, because, you know, accidents happen unfortunately." Pl.'s App. Ex 10, Dep. Tr. of Cpt. Kober at 64. He continued by pointing out there was "no rhyme or reason" as to where vehicles were parking on the Plots. *Id.* He distinguished the Plots from other tailgates he has worked by stating, "There's very limited access to where cars can come in and out of" at other events he has worked, unlike the Plots during Homecoming. *Id.* at 76.

Homecoming, could be deemed a prior incident under Section 344, as part of the "circumstantial setting"[130] that DSU should have assessed in measuring its security needs for the Plots. However, instead of taking the shooting incident into account, DSU appears to have abandoned any new safety protocols stemming from the prior incident because of DSU's delineation between a "sanctioned student event[]" and an "informal event"[131]— a fact that should be weighed by a jury. Finally, as appears from the evidence viewed in the light most favorable to the non-moving parties, DSU did not provide any "servants to afford . . . reasonable protection" in the Plots during Homecoming.[132]

Taking all of this into consideration, this Court concludes that it would be inappropriate to find this incident not foreseeable as a matter of law.[133]

---

[130] *See Jardel*, 523 A.2d at 526.

[131] Pl.'s App. Ex. 5, Dep. Tr. of Downing at 99.

[132] *Furek*, 594 A.2d at 521; *see also Bearman v. Univ. of Notre Dame*, 453 N.E.2d 1196, 1198 (Ind. Ct. App. 1983) ("The University is aware that alcoholic beverages are consumed on the premises before and during football games. The University is also aware that "tailgate" parties are held in the parking areas around the stadium. Thus, even though there was no showing that the University had reason to know of the particular danger posed by the drunk who injured Mrs. Bearman, it had reason to know that some people will become intoxicated and pose a general threat to the safety of other patrons. Therefore, Notre Dame is under a duty to take reasonable precautions to protect those who attend its football games from injury caused by the acts of third persons. The questions whether the protective measures employed by Notre Dame were inadequate and, if so, whether such inadequacy contributed to Mrs. Bearman's injury are questions for the jury.").

[133] DSU directs this Court to a recent decision, *Cantatore v. Univ. of Delaware*. 2021 WL 2745107, at *1 (Del. Super. June 30, 2021). In *Cantatore,* this Court found, on a motion to dismiss, that the University of Delaware did not owe a duty to the plaintiff as a matter of law because the University neither could have foreseen the incident nor had control over the incident. *Id.* at *3. With respect to foreseeability, this Court found that a non-university officer's arrest of the plaintiff outside of a classroom "in the manner in which it transpired was not foreseeable . . . [because] nothing in [plaintiff's] Amended Complaint suggest[ed] that the University has any type of assumed duty to protect students from conduct akin to Officer Fountain's arrest . . . ." *Id.* at *3. With respect to control, this Court found that the University did not have control over a non-university affiliated police officer who was executing an arrest because any action by the University to help the officer find the student on campus was more in line with the statutory charge of 11 *Del. C.* § 1911(d)*, i.e.*, "to inform the primary jurisdictional agency about the location of an arrest." *Id.* at *3. In this case, by contrast, the incident resulting in Plaintiffs' injuries was foreseeable for all the reasons stated *supra*. Moreover, while DSU did not directly control Ligon's

24

**3. The issue of Ligon's actions as a superseding, intervening cause should go to the jury.**

Finally, in assessing potential summary judgment on Plaintiff's negligence claims against DSU, the Court must consider the issue of superseding cause. The Delaware Supreme Court has made clear that the question of superseding causation is almost always left for the jury.[134] "[O]nly where there can be no reasonable difference of opinion as to the conclusion to be reached on the question of whether an intervening cause is abnormal, unforeseeable, or extraordinary negligent, should the question be determined by the Court as a matter of law."[135]

Here, although the Court will find *infra* that Ligon's negligence can be used for issue preclusion purposes, it is clear from Ligon's criminal trial transcript that his negligence was not determined by the fact finder to be extraordinary or abnormal. This Court, presiding over Ligon's criminal bench trial, stated that Ligon's action of hitting the gas instead of the brake "while . . . *not unimaginable* . . . is a negligent act. . . . Thus, the actions of Mr. Ligon, while *entirely accidental*, are at least to some degree singly and cumulatively negligent."[136]

Hence, it would be inappropriate to characterize an "[]imaginable" and "accidental" act by Ligon as either extraordinarily negligent or abnormal as a matter of law, given that this Court heard testimony on the issue and determined otherwise. On the issue of whether the accident was unforeseeable, it is important to note, and DSU concedes, that foreseeability does not require the exact type of harm that could be foreseen to occur but looks to the general type of harm. "An event is foreseeable

---

conduct, it certainly had control over the Plots and the security procedures that could have affected both third parties' access to the area and careless behavior taking place within that area.
[134] *Duphily v. Delaware Elec. Co-op., Inc.*, 662 A.2d 821, 830-831 (Del. 1995).
[135] *Id.* at 831.
[136] DSU's App. Ex. 44, Crim. Trial Tr. at C-46 (emphasis supplied).

if a defendant should have recognized the risk of injury under the circumstances. It is irrelevant whether the particular circumstances were foreseeable."[137]

As noted *supra*, this Court's function is not to "weigh[] facts regarding foreseeability."[138] Whether the incident was unforeseeable, as noted *supra,* is not ripe for the Court's determination. Thus, the superseding causation issue will be left for the jury.

**B. Issue Preclusion Applies to the Question of Ligon's Negligence.**

Issue preclusion, also known as collateral estoppel, requires the following elements to be established:

> (1) The issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.[139]

As noted *supra*, in Ligon's criminal trial, this Court found that "the actions of Mr. Ligon . . . are at least to some degree singly and cumulatively negligent."[140] This is not a case where Ligon merely pled guilty, which typically has been deemed sufficient for issue preclusion.[141] The issue of Ligon's negligence was considered

---

[137] *Del. Elec. Co-op., Inc. v. Pitts*, 633 A.2d 369, 1993 WL 445474, at *2 (Del. Oct. 22, 1993) (TABLE).
[138] *Rogers*, 2006 WL 2085460, at *2.
[139] *Betts v. Townsends, Inc.,* 765 A.2d 531, 535 (Del. 2000) (quoting *State v. Machin*, 642 A.2d 1235, 1239 (Del. Super. 1993)).
[140] DSU's App. Ex. 44, Crim. Trial Tr. at C-46.
[141] *See Petrella v. Alexander*, 1991 WL 236921 (Del. Super. Nov. 8, 1991) (finding collateral estoppel by means of a guilty plea); *but see Benjamin F. Shaw Co. v. Short*, 1989 WL 89521, at *4 (Del. Super. June 28, 1989) ("Therefore, to bind this defendant to the plea agreement in a subsequent civil action when the necessary facts to conclusively establish the elements of the civil suit were objected to at that time, would be, in my view, to impose an unreasonably harsh penalty on the defendant. This court is not willing to allow offensive collateral estoppel which, in effect,

by a fact-finder under a much higher burden of proof—*i.e.*, beyond a reasonable doubt—than it would be in this action.[142]

Furthermore, all elements of issue preclusion are met: 1) the issue of negligence was presented at Ligon's criminal trial, and this Court determined that Ligon was negligent as an element of Vehicular Assault; 2) the criminal trial was adjudicated on the merits and Ligon was sentenced for his crimes; 3) Ligon is the same defendant as in the criminal trial; and 4) Ligon had a full and fair opportunity to present his case to this Court. Therefore, Ligon's negligence will be issue-precluded for the remainder of this litigation.[143]

## C. DSU Is Entitled to Summary Judgment on Plaintiffs' Claims for Punitive Damages.

The Court next considers whether DSU is entitled to summary judgment on the issue of punitive damages. Where there is no contention by any of the parties

---

would dispose of this action under the guise of undisputed facts, when it is clear that those facts are now and were then in dispute.").

[142] *Higgins v. Walls*, 901 A.2d 122, 138 (Del. Super. 2005) (concluding that issue preclusion existed in a civil trial as the result of a criminal adjudication because the fact finder's determination "[is] more conclusive (beyond a reasonable doubt) than the probability standard at work in [a civil trial]."); *see also Brooks Armored Car Serv., Inc. v. Payne*, 1992 WL 54260, at *2 (Del. Super. Mar. 9, 1992) (finding collateral estoppel from a conviction by a jury in a criminal case).

[143] Ligon did not contend at oral argument that issue preclusion was not proper regarding his negligence. However, Ligon's counsel argued that even if his negligence is issue-precluded in this case, Ligon would like to be able to testify on the issues of punitive damages, and therefore his counsel felt compelled to argue against issue preclusion. This Court does not foresee any issues with Ligon's testifying as to the extent of his negligence during the trial for punitive damages purposes. As always, DSU or any party may ask for a limiting instruction when the time comes. *See Beebe Med. Ctr., Inc. v. Bailey*, 913 A.2d 543, 546 (Del. 2006), *as amended (*Nov. 15, 2006) (finding that the trial judge was not required to trifurcate a trial, which would have included separating out the plaintiff's claims for punitive damages, when the trial judge offered "to consider a limiting instruction designed to assure that the jury considered only evidence relevant to each separate category of damage claim in order to avoid or minimize any potential prejudice to [ the other party]").

that the conduct was "intentional or malicious,"[144] the conduct must be "tested under the standard of recklessness, *i.e.*, a conscious indifference for the rights of others."[145]

Recklessness requires two elements.[146] First is the act itself.[147] The second element is "crucial" and "involves the "actor's state of mind and the issue of foreseeability, or the perception the actor had or should have had of the risk of harm which the conduct would create."[148] Further, "[w]here the claim of recklessness is based on an error of judgment, a form of passive negligence, the plaintiff's burden is substantial" and "[i]t must be shown that the precise harm which eventuated must have been reasonably apparent but consciously ignored in the formulation of the judgment."[149] "The penal aspect and public policy considerations which justify the imposition of punitive damages require that they be imposed only after a close examination of whether the defendant's conduct is 'outrageous,' because of 'evil motive' or 'reckless indifference to the rights of others.'"[150]

Here, both parties participated in an exhaustive discovery process. There were a multitude of depositions and exhibits provided to this Court. The parties were given an opportunity to cross-examine the witnesses during depositions and test their knowledge regarding DSU's "formulation of . . . judgment"[151] in planning Homecoming. The Court has carefully reviewed all submissions from the parties.

---

[144] *Jardel*, 523 A.2d at 530.

[145] *Id.*

[146] *Id.*

[147] *Id.* In *Jardel*, the "act itself" was "the decision to provide limited security in areas to which the public has been invited," which mirrors DSU's conduct in this case. *Id.*

[148] *Id.*

[149] *Id.* at 531; *see also id.* ("In this case, Jardel might reasonably have been on notice concerning the incidents of general criminal conduct occurring in its parking lot. But no incident approaching the magnitude of the kidnapping and rape of the plaintiff had been reported in the thirteen months of the Globe contract. Even those incidents which might be deemed assaultive pale in comparison with the attack on the plaintiff.").

[150] *Id.* at 529 (citing Restatement (Second) of Torts § 908, cmt. b (1979)).

[151] *Id.* at 531.

Upon review, it is clear to the Court that neither party contends that DSU's conduct was "intentional or malicious."[152] Instead, this is a case of an "error of judgment"[153] on DSU's part regarding security procedures and planning that arguably allowed Ligon's entry by vehicle into the Plots and the resulting injuries to Plaintiffs. Therefore, the test for punitive damages is a recklessness standard, and the Court will look to whether the two elements, as identified in *Jardel,* are met.

First, the Court finds that the decision not to assign DSUP officers to the Plots, along with the decision not to erect barriers to entry on University Drive, are sufficient acts to satisfy the first element.[154] However, the second element is not met.[155] In this case, DSU might reasonably have been on notice concerning the density of people that congregate in the Plots during Homecoming. In addition, DSU might reasonably have been on notice that there existed a potential for harm to occur. However, no incident approaching the magnitude of what occurred on October 24, 2015, had occurred on the Plots prior to Homecoming. Indeed, there is no evidence that there had been any vehicular accident involving pedestrians in the grassy area of the Plots prior to October 2015. The "precise harm"[156] of a runaway vehicle's causing injury to multiple pedestrians was neither reasonably apparent nor consciously ignored by DSU in the formulation of the judgment in question,[157] *i.e.*, the decisions not to assign officers to the Plots and not to erect vehicular barriers.

---

[152] Moore's Answering Br. at 33 ("Here, plaintiff does not contend that DSU's conduct was intentional or malicious.") (adopted by McNeal and Spriggs).

[153] *Jardel*, 523 A.2d at 531; *but see* Moore's Answering Br. at 34 (contending that DSU not only made an "error in judgment" but "displayed conscious indifference to the safety of [visitors]."

[154] *Compare Jardel,* 523 A.2d at 530 (finding the act, "the decision to provide limited security in areas to which the public has been invited," to satisfy the first element.)

[155] *Compare id.* at 531 ("It may have been an error in judgment, and thus negligence, for Jardel not to opt for a larger security force, but it can hardly be said that Jardel turned its back on a known risk.").

[156] *Id.*

[157] *Id.*

Again, there is simply no evidence in the record that DSU, in making its decisions, consciously ignored a "known risk" of the precise harm that ultimately occurred.[158]

## VI. CONCLUSION

For the reasons discussed above, DSU's Motion for Summary Judgment is **DENIED IN PART** and **GRANTED IN PART**:

I. DSU's motion for summary judgment on Plaintiffs' negligence claims and, by extension, on Ligon's cross-claims and third-party claims deriving from the claims of all plaintiffs, is **DENIED.**

II. DSU's motion for summary judgment on the issue of Ligon's negligence, for the purpose of collateral estoppel, is **GRANTED**.[159]

III. DSU's motion for summary judgment to find, as a matter of law, that DSU is not liable for punitive damages is **GRANTED.**

IV. DSU's motion for summary judgment to dispose of any contract claims against it regarding this case is **GRANTED.**[160]

**IT IS SO ORDERED.**

/s/Noel Eason Primos
Judge

NEP/wjs
*Via File & ServeXpress*
Oc:  Prothonotary
Counsel of Record

---

[158] *Id.*

[159] This ruling, as the law of the case, applies to (and therefore benefits) both DSU and all of the plaintiffs.

[160] *See supra* note 59.